# Richmond

## Barry Clinton Johnson, Alias, Etc. v. Commonwealth of Virginia.

January 15, 1968.

Record No. 6696.

Present, All the Justices.

*J. Hugo Madison; Edward Delk (Gordon L. Starks, Jr.; Madison and Delk*, on brief), for plaintiff in error.

*Reno S. Harp, III, Assistant Attorney General (Robert Y. Button, Attorney General*, on brief), for defendant in error.

BUCHANAN, J., delivered the opinion of the court.

A few minutes after ten o'clock of the evening of November 15, 1965, Mrs. Shirley Hall Healy was shot and killed by a man who forced his way into her automobile as she stopped at the intersection of Duval avenue and Main street, Route 17, in the town of Gloucester, in Gloucester county.

The defendant, Barry Clinton Johnson, was indicted for the killing. He was tried by a jury which found him guilty of murder in the first degree and fixed his punishment at death. He was sentenced in accordance with the verdict and we granted a writ of error to consider his assignments of error. He contends here that the trial court erred in the admission of testimony; that Virginia's method of determining guilt and punishment is unconstitutional, and that the verdict was contrary to law and the evidence.

The evidence presented by the Commonwealth—the defendant offered none—was as follows:

On the evening of November 15, 1965, at about ten o'clock, Mrs. Healy, who had been attending an art class, drove her automobile to the home of a friend, Mrs. Bailey, and there picked up her two young sons and drove away on Duval avenue toward Main street, some two hundred feet distant. A few minutes later the older boy "burst into the side door" of the Bailey home; "he was horrified." He told Mrs. Bailey what had happened and she went with him to the scene. There Mrs. Healy was lying on the street beside her car, the left door of which was open. She was dead from a .38 caliber bullet that had been fired at close range into the back of her head and into her brain.

As the car stopped at the intersection a man, identified in the evidence as the defendant, opened the right-hand door and got in. He

said, "listen lady, I have a gun and I don't want to use it. * * back up." Mrs. Healy did not obey, but drove ahead across Main street onto the sidewalk and was getting out of the car when the defendant leaned over and hit her and then shot her and ran away.

[1] Four witnesses testified to seeing the defendant in a restaurant on Route 17, Main street, some thirteen hundred feet from the intersection where Mrs. Healy was killed. They saw him leave the restaurant about 10 p.m. and two of them saw him walking toward the intersection. The operator of a radio shop located on Main street about seventy feet from the intersection saw "this man" walk by at about 10 p.m. going toward the intersection. Two or three minutes later he heard tires squeal, saw the car cross the street at the intersection, jump the curb and hit the bank. The horn started blowing, he heard a woman scream, then a shot was fired, and in the light of his own car he saw "a colored man" jump out of the car and run down Walker avenue (on the opposite side of the street from Duval avenue).

A deputy sheriff, Roland F. Smith, arrived at the scene at 10:20 p.m. and proceeded to examine the Healy car for fingerprints and finding some he sealed them over and locked the car. Early next morning Henry L. Mundie, an investigator for the Virginia State Police, examined the car, found a number of latent prints and on examination by Julius C. Jones, a fingerprint examiner of the Federal Bureau of Investigation, a palm print found on the chrome inside of the car was found to be identical with a deliberate left palm print of the defendant.

In addition, Harry Healy, Jr., the older son of Mrs. Healy, who was seated on the floor of the car beside the right front door and saw the man enter through that door, identified the defendant as the slayer of his mother.

This boy was ten years old at the time of the trial. Before he testified before the jury he was subjected to a long and searching examination by the skillful counsel of defendant to test his competency. *Cross v. Commonwealth*, 195 Va. 62, 64, 77 S.E.2d 447, 448. His responses were impressive and at the conclusion of the examination no objection was made as to his competency. Before the jury he testified that the man entered the car and struck and shot his mother as above described. He was then asked, "do you see that man in the courtroom?" He replied, "Yes, sir. * * Right here" and pointed to the defendant.

On cross-examination defendant's counsel asked him if he wanted "to tell these men why are you here this morning". He replied, "To convict the man that killed my mother." He was then shown the picture of a group of ten colored men (filed as defendant's Exhibit No. 1) and was asked if he had not previously picked the defendant out of this picture. He replied, "Yes, sir. Right there." He said the picture had been shown to him by Mr. Jones (Commonwealth's attorney) four or five days after the occurrence. He was then asked if the man he picked out was not the only one in handcuffs. He replied, "Yes, sir. I wasn't looking at the hands, I was looking at the faces." He was asked if he became positive after seeing the picture. His reply was, "I wasn't positive when I saw him, but after I looked at it for a while, I was sure of it. I was positive I knew that was him."

The only question on the sufficiency of the evidence was whether the identity of the defendant was proved. Very clearly it was and the verdict of the jury was firmly supported by the evidence.

[2] Defendant contends that the court erred in admitting the testimony of Deputy Sheriff Smith regarding his observations inside defendant's motel room "entered without warrant or probable cause" in violation of the Fourth and Fourteenth Amendments to the Constitution of the United States. The evidence discloses no such violation.

Smith testified that at 2:35 o'clock of the morning of November 16, after the killing, he went to the Watkins Motel, obtained the number of defendant's room and knocked on the door. Defendant opened the door, Smith told him who he was and showed him his badge. Defendant then invited him in, saying, "come in." Defendant was dressed in shorts with no shirt on. After talking to defendant about fifteen minutes Smith noticed that he had a slight wound on the right side of his head.

This was all that Smith testified to in regard to the visit. He said nothing about any conversation he had with defendant in reference to the crime. This evidence would seem wholly unimportant. In any event it furnishes no cause for reversal. Defendant's reliance on *Johnson* v. *United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436, is misplaced. That case involved entry, search, seizure and arrest. Entry was there demanded "under color of office. It was granted in submission to authority rather than as an understanding and intentional waiver of a constitutional right." Here there was entry by invitation and there was no search, no seizure and no arrest. "It is

'not a search to see what is patent and obvious either in daylight or even in artificial light.'" *Robbins* v. *MacKenzie*, 1 Cir., 364 F.2d 45, 47, cert. den., 385 U.S. 913, 87 S.Ct. 215, 17 L.Ed.2d 140, distinguishing *Johnson*. If the presence of the officer in the room was lawful, "the observation of what was then and there immediately apparent could not in itself be a wrong. * * The visit of the officers was attended by no purpose which required a warrant." *United States* v. *Horton*, 3 Cir., 328 F.2d 132, 135.

[3] Defendant says next that the court erred in admitting the fingerprints of the defendant "taken in Norfolk, Virginia, on November 16, 1965, while the defendant was illegally arrested and detained in violation of the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States."

Again his contention is not supported by the evidence.

As stated, the latent prints were taken by Investigator Mundie of the Virginia State Police from the Healy automobile and Mundie also took the deliberate prints, *i.e.*, prints from the hands of the defendant. With respect to the latent prints, Mundie testified that they were kept in his possession and personally taken by him to the F.B.I. laboratory in Washington and there turned over to Jones, the examiner.

At the same time Mundie delivered to Jones the fingerprints and palm prints of the defendant, which he took on November 16, 1965, at State Police Headquarters in Norfolk. On objection to the introduction of the latter, Mundie was questioned out of the presence of the jury and testified that defendant had been previously advised "of his rights to an attorney and that anything that he said could be used against him in court, and that he did not have to make any statement, and that it was voluntary on his part when he agreed to go to Norfolk. He went there of his own free will, and he was not in custody at the time." On cross-examination Mundie said he did not tell defendant that if he did not have any money he would be given an attorney at no expense to him. He was asked, "Did you know also back in November 1965, November 16, that if this man had no means to hire a lawyer, an attorney, that the State of Virginia would afford him one at the time he was being interrogated?" He replied, "No, sir, I did not know that."

Mundie further testified, however, that he fingerprinted the defendant before he talked to him and that defendant was not then under arrest; that defendant went with him to Norfolk of his own

free will, and he told defendant he would like to take his finger-prints and went ahead and took them.

After the fingerprinting the defendant gave a written statement but, as his counsel stated at the trial, "we are not too concerned with that because it has not been sought to be introduced * *."

The evidence is, as stated, that he was not in custody when the fingerprints were taken and that they were taken in Norfolk, where defendant went voluntarily and submitted to the taking of the prints without objection. There is no contradiction of this testimony.

Moreover, in *Schmerber* v. *State of California*, 384 U.S. 757, 764, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908, 916, decided less than a month before the present case was tried, in which it was held that the taking of Schmerber's blood over his objection did not violate any of his constitutional rights, it was said:

> "* * both federal and state courts have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it." See also *Holt* v. *United States*, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021; *Owens* v. *Commonwealth*, 186 Va. 689, 702, 43 S.E.2d 895, 901; Annotation, 28 A.L.R.2d 1115, 1136-38.

[4] Defendant next asserts that "The discretion given Virginia jurors to decide whether a man convicted of murder shall live or die is arbitrary and unconstitutional for the reason that the jury is not charged as to standards pertinent to sentencing * *." He says this violates the Fifth and Fourteenth Amendments to the Constitution of the United States. He made no such contention in the trial court, so far as the record shows, as required by Rule 1:8 of our Rules of Court. Aside from this, however, we find no merit in this contention. Section 18.1-21 of the Code of Virginia, Vol. 4, 1966 Cum. Supp.,[1]

---

[1] § 18.1-21. Murder, first and second degree, defined.—Murder by poison, lying in wait, imprisonment, starving, or by any wilful, deliberate, and premeditated killing, or in the commission of, or attempt to commit, abduction as defined in § 18.1-38, arson, rape, robbery or burglary is murder of the first degree. All other murder is murder of the second degree.

defines murder in the first degree, and § 18.1-22[2] provides that it shall be punishable with death or by confinement in the penitentiary for life, or for any term not less than twenty years.

In *Giaccio v. State of Pennsylvania*, 382 U.S. 399, 402, 86 S.Ct. 518, 520-21, 15 L.Ed.2d 447, 450, the court held that a Pennsylvania statute, which provided that in all cases of acquittal on indictments for offenses other than felonies the jury should determine whether the defendant should pay the costs, was unconstitutional because so vague and standardless "that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case. * *" But the court was careful to say this in a footnote:

"In so holding we intend to cast no doubt whatever on the constitutionality of the settled practice of many States to leave to juries finding defendants guilty of a crime the power to fix punishment within legally prescribed limits." 382 U.S. at 405 n. 8, 86 S.Ct. at 522, 15 L.Ed.2d 451. For similar holdings see *Andres v. United States*, 333 U.S. 740, 68 S.Ct. 880, 92 L. Ed. 1055; *State v. White*, 60 Wash.2d 551, 570-72, 374 P.2d 942, 953-55; *In re Ernst's Petition*, 3 Cir., 294 F.2d 556.

In the case last named it was said:

"* * But such unguided discretion in the choice between penalties which may be imposed under a first degree verdict has long been characteristic of the laws of the United States and of many states. Some twenty states confer this power upon juries in murder cases. * *" 294 F.2d at 560.

We have been cited to no case, and have found none, which holds that a statute similar to Code § 18.1-22, *supra*, permitting a jury to exercise discretion within limits fixed by the statute in the punishment for the crime of first-degree murder violates any constitutional right of the defendant.

[5] Finally, defendant contends that the Virginia procedure of submitting to the jury simultaneously the issue of guilt and the determination of punishmnet precludes a rational decision by the jury

---

[2] § 18.1-22. First degree; how punished.—Murder of the first degree shall be punished with death, or by confinement in the penitentiary for life, or for any term not less than twenty years.

and burdens defendant's privilege against self-incrimination. He argues that due process of law demands that in capital cases the jury first determine the issue of guilt, and then the defendant and the prosecution should be allowed to present evidence relevant to punishment so that the jury could make an intelligent decision.

His argument is that under the present system, if the defendant personally desires to present before the jury information concerning his background and his character he must waive his privilege against self-incrimination by appearing before the jury before his guilt has been determined. In effect he urges this court to hold unconstitutional a long-established statutory system for the determination and punishment of crime, and replace it with some type of split-verdict procedure. He does this without pointing to any authority which holds unconstitutional the "single-verdict" procedure as used in this Commonwealth and in many other States.

In *United States* v. *Curry*, 2 Cir., 358 F.2d 904, 914, it is said: "while the Supreme Court has never passed directly on the question, it has dealt with and upheld these statutes under the assumption that they provide for a unitary trial."

If there is merit in the suggested procedure, it is for the legislative branch of the government to determine. It appears that the legislatures of at least five of the States have established such procedure. 53 Va. Law Rev. 968, 997. And see the argument of Judge McGowan in his separate opinion in *Frady* v. *United States*, D. C. Cir., 348 F.2d 84, cert. den. 382 U.S. 909, 86 S.Ct. 247, 15 L.Ed.2d 160, in which he expresses his view at page 92 that such two-stage procedure is most desirable "even if the Constitution be not thought to require it."

Such change in the Virginia procedure, however, should be left to the General Assembly and decided after full hearing and consideration. There is nothing in the present case to establish that the procedure followed deprived defendant of any constitutional right.

The case was well and carefully tried; defendant was ably represented by employed counsel; the evidence established that the defendant committed a cruel, deliberate murder and it was clearly sufficient to support the verdict of the jury.

The judgment appealed from is

*Affirmed.*