UNITED STATES of America,
Plaintiff-Appellee,

v.

Dennis Essington GREEN,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Daniel S. FRANO, Defendant-Appellant.

Nos. 76–1461, 76–1462.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 7, 1976.

Decided Feb. 11, 1977.

Thomas Paris, Cleveland, Ohio (Court-appointed CJA), for defendant-appellant in No. 76–1461.

Michael G. Dane, Richard A. Damiani, Cleveland, Ohio, for defendant-appellant in No. 76–1462.

Frederick M. Coleman, U. S. Atty., Nancy C. Schuster, Cleveland, Ohio, for plaintiff-appellee.

Before EDWARDS, CELEBREZZE and PECK, Circuit Judges.

CELEBREZZE, Circuit Judge.

Appellants ask us to overturn their convictions after a joint trial by jury upon a one-count indictment charging conspiracy to knowingly or intentionally manufacture a Schedule I controlled substance, Dimethyltryptomine ("DMT"), in violation of 21 U.S.C. § 841(a)(1);[1] 21 U.S.C. § 846. The indictment charged that during a two month period commencing on or about October 24, 1974, Appellants conspired to manufacture DMT. In furtherance of this illicit agreement, they allegedly amassed all of the paraphernalia needed to accomplish their illegal objective, including a booklet containing a "recipe" for synthesizing the hallucinogenic drug and quantities of all of its chemical constituents ("precursors").

In this consolidated appeal, Appellants advance three grounds for reversal of their convictions. First, they jointly assert that the evidence presented by the Government was legally insufficient to prove the existence of a criminal conspiracy. Second, Appellant Frano individually contends that the trial court committed reversible error by permitting government agents to testify to the substance of three out-of-court statements attributed to him which he asserts were improperly withheld from the defense prior to trial and then erroneously received in evidence through misapplication of the co-conspirator's exception to the hearsay rule. Third, Appellant Green claims that the court denied Appellants a fair and impartial trial by sanctioning the admission into evidence of government expert testimony concerning matters which were irrelevant to proving the crime charged and which confused and prejudiced the jury.

---

1. 21 U.S.C. § 841(a)(1) reads as follows:

(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;

\* \* \* \* \* \*

Appellants' five-day trial commenced on September 15, 1975. The Government presented seven witnesses during its direct case. Following the trial court's denial of Appellants' motions for acquittal, Frano took the stand in his own defense. Green did not testify or present any witnesses.

In summary, the Government's evidence established the following relevant facts:

On October 15, 1974, an unidentified man using the name "Dennis Green" purchased five chemical precursors of DMT from Fisher Scientific Company in Warrensville Heights, Ohio. On October 24th, a man also identifying himself as "Dennis Green" placed a telephone order with Sargent-Welch Company, a chemical supply house located in Garfield Heights, Ohio, for two additional precursors of DMT. The company notified agents of the Federal Drug Enforcement Taskforce ("DEA") who responded by setting up a street surveillance of the premises on November 20th, the day on which the purchaser was expected to pick up his order. On that same day William P. Lehman, a local police officer posing as a stockman, was stationed in Sargent-Welch.

That afternoon Appellants were observed to enter Sargent-Welch together. Once inside, Green identified himself as an employee of "Shaker Ford." Frano knew at the time that Green did not work there. Sargent-Welch had an established policy of never selling chemicals to individuals. Although Green paid for the single chemical which the company had in stock at the time, both Appellants individually inspected the package. At this point Frano was overheard to say to Green: "Let's see if they have any ether while we're here." Ether is itself a DMT precursor. Thereupon, Green immediately ordered and paid for a quantity of ether. Appellants exited the premises together. They each carried one of the two packages, although both items could have been handled easily by one person. They left the scene in Green's automobile and were followed by agents to the vicinity of Frano's residence. Frano exited the vehicle and Green proceeded to his own residence.

In December of 1974, Green placed a second telephone order with Sargent-Welch for additional DMT precursors. On December 17th, officer Lehman telephoned Green and notified him that his order was ready for pick-up. Green's residence had been under surveillance. Shortly after Lehman's call, agents observed Green leave his residence by automobile, pick up Frano at his home, and drive to Sargent-Welch. Appellants entered the company premises together. While they were waiting for the order to be filled, they perused a laboratory glassware catalogue. At this time Frano was overheard to remark to Green: "Why don't we wait until we see what we have in Ashtabula first before we buy any glass." Both Appellants in turn inspected the chemical packages, Green paid the bill, and they then left the premises. They drove in Green's automobile to their respective residences.

On December 20th, Government agents obtained a search warrant and raided Green's residence. They discovered and seized a box containing quantities of nine chemicals, constituting all of the DMT precursors, and a booklet entitled "Drug Manufacturing for Fun and Profit." Included in the booklet were complete instructions for synthesizing DMT in the home. Green was placed under arrest. On December 26th, Frano was arrested at which time he stated to the agents involved: "I've been waiting for you. Thanks for waiting 'til after Christmas."

David Parmalee, a supervisor of chemical analysis for the Food and Drug Administration, qualified as an expert witness for the Government. He described the chemical composition of DMT and the administrative procedure by which it was classified as a Schedule I controlled substance. He also explained the significance of that designation. He testified at length concerning the drug's psycho-pharmacological properties and analogized its hallucinogenic effects upon human beings to those of LSD. He estimated that approximately one-thousand "dosage units" of DMT could be produced from the quantity of precursor chemicals

seized in Green's residence, and he concluded that no other substance could be synthesized from this unique array of components.

DEA Agent George Simmons, after a prolonged recitation of his experience as an undercover purchaser of dangerous drugs on the street, testified that the average, illicit sale price of a DMT "dosage unit" ranged from seventy cents to six dollars, depending upon prevailing supply and demand and upon the quantity of drug involved.

■ Appellants challenge the sufficiency of this evidence to sustain the verdicts. Once there has been a conviction in a criminal case, appellate courts are bound to view the totality of the evidence in the light most favorable to the Government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Dye*, 508 F.2d 1226, 1231 (6th Cir. 1974). Concomitantly, all reasonable inferences must be drawn which are consistent with the verdict. *United States v. Scales*, 464 F.2d 371, 373 (6th Cir. 1972). Inferential proof may be controlling where the offense charged is so inherently secretive in nature as to permit the marshalling of only circumstantial evidence. This is the norm in drug conspiracy prosecutions, *see, e. g., United States v. Sin Nagh Fong*, 490 F.2d 527, 530 (9th Cir. 1974). The Government presented no *direct* evidence that a conspiratorial agreement existed between Frano and Green and that the aim of such an agreement was the manufacture of DMT. Rather, the jury was called upon to infer from circumstantial evidence alone the existence of the elements necessary to prove Appellants' guilt.

■ This Court has long recognized that purely circumstantial evidence may be sufficient to sustain a conspiracy conviction. *United States v. Chambers*, 382 F.2d 910, 913 (6th Cir. 1967). The permissible inferences to be drawn from such evidence need not be consonant only with an hypothesis of guilt, *United States v. Luxenberg*, 374 F.2d 241, 249 (6th Cir. 1967), providing that the totality of the evidence is substantial

enough to support a finding of guilt beyond a reasonable doubt. By our own definition:

Substantial evidence is more than a scintilla. It means such relevant evidence as a reasonable mind might accept to support a conclusion. It is evidence affording a substantial basis of fact from which the fact in issue can be reasonably inferred.

*United States v. Martin*, 375 F.2d 956, 957 (6th Cir. 1967).

■ The Government's burden in this trial was to prove that Appellants intentionally agreed to manufacture DMT and that one or both of them committed an overt act in furtherance of that joint criminal venture. *United States v. Craig*, 522 F.2d 29, 31 (6th Cir. 1975). Our reading of the record convinces us that the evidence was sufficient to make out all of the elements of a prima facie case. Therefore, the trial court was correct in denying Appellants' motions for acquittal and allowing the case to go to the jury.

Appellants were observed together on three separate occasions, under circumstances which could reasonably have been construed by the jury as sharing a nexus to the manufacture of DMT. The jury was entitled to infer that these were not coincidental tandem appearances, but rather some proof that Appellants were embarked upon a joint undertaking. *United States v. McGruder*, 514 F.2d 1288, 1290 (5th Cir. 1975). The jury could also infer from the substance of Frano's three out-of-court statements, two of which were made to Green, that Frano was a knowing participant in the criminal venture and that he was conscious of his guilt. Finally, even assuming that no booklet containing a DMT "recipe" had been discovered in Green's possession, the jury could reasonably infer, from the fact that the chemicals found were exactly those required to manufacture DMT, that Appellants intended to produce that drug. *United States v. Noreikis*, 481 F.2d 1177, 1181–1182 (7th Cir. 1973).

■ We find no merit in Appellant Frano's assignment of error regarding restricted discovery of his out-of-court statements.

His arguments on appeal manifest a misapprehension of the applicable law. For purposes of application of the pre-trial discovery provisions of the Federal Rules of Criminal Procedure, he would have us equate his own spontaneous, unsolicited admissions, made within hearing of an undercover police officer, to a defendant's responses to direct questions posed by a government agent during a criminal investigation. Rule 16(a)(1)(A) of the Federal Rules of Criminal Procedure provides that only statements made "in response to interrogation by any person then known to the defendant to be a government agent" or statements which have been written down or recorded are discoverable by the defense. None of Frano's three oral statements satisfied any of these criteria, and therefore none was discoverable in advance of trial.

■ Frano further objects to the fact that the substance of one of his statements was elicited by the prosecutor in contravention of the trial court's *in limine* ruling that none of the statements be disclosed to the jury prior to the formal determination of their admissibility. The trial court squarely addressed this issue in disposing of Frano's motion for mistrial based upon this ground. We concur in its finding that this technical transgression by the prosecutor was not a product of bad faith. We also agree that, in any event, the statement was substantively admissible. Any procedural aberration represented by its premature exposure to the jury did not affect substantial rights and was harmless under Rule 52(a) of the Federal Rules of Criminal Procedure.

■ In the alternative, Frano contends that his statements were improperly received in evidence through the trial court's misapplication of the co-conspirator's exception to the hearsay rule. Fed.R.Evid. 801(d)(2)(E). This objection was never properly raised at trial. For us to recognize it now would require a finding of plain error pursuant to Rule 52(b) of the Federal Rules of Criminal Procedure. Given the ambiguous content of the statements and their decidedly nonassertive tone, we cannot say that their evidentiary use against the declarant as admissions impinged upon substantial rights which he enjoyed at trial. Fed.R.Evid. 801(d)(2)(A); *United States v. Nixon*, 418 U.S. 683, 701 n. 13, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). In fact, we can find no basis in the case law for reliance upon this rule of evidence by a *declarant* when the rule explicitly imposes pre-conditions for admissibility intended to protect only his co-conspirators. *See e. g., United States v. Krulewitch*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949); *United States v. Craig*, 522 F.2d 29 (6th Cir. 1975); *United States v. Oliva*, 497 F.2d 130 (5th Cir. 1974); *United States v. Schorr*, 462 F.2d 953 (5th Cir. 1972).

■ Only Green could possibly have been aggrieved by any allegedly improper use of Frano's out-of-court statements to prove the existence of the conspiracy.[2] We choose to interpret Green's failure to object to their admission, either during the trial or on appeal, as tacit recognition by him that the statements were properly received. Had Green wished to raise the 6th Amendment confrontation issue, however, we believe that Frano's taking the stand in his own behalf deprived Green of standing to object. *Nelson v. O'Neil*, 402 U.S. 622, 629–

---

2. Ironically, Frano includes in his brief a quotation from *United States v. Nixon* which supports this conclusion:

> Declarations by one defendant may *also* be admissible *against other defendants* upon a sufficient showing, by independent evidence, of a conspiracy . . . if the declarations at issue were in furtherance of that conspiracy.

418 U.S. 683, 701, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974) (emphasis added).

Frano's statements were offered to prove his state of mind, *i. e.*, his conscious participation in the criminal joint venture. Unfortunately, because only Frano and Green were charged with the crime, statements tending to build a case against Frano reciprocally implicated Green. Whereas Green might have raised an objection to this during the trial, based upon an alleged denial of his right to confront and cross-examine Frano, who had no obligation to take the stand in his own defense, Frano had no standing to object because his statements qualified under an independent exception to the hearsay rule. *Id.* at 701 n. 13, 94 S.Ct. 3090.

630, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971). The evidentiary reliability of Frano's "hearsay" was assured by Green's opportunity to cross-examine him. In any event, Frano's direct testimony was exculpatory of both defendants.

■■■■ Green argues on appeal, as the third and final assignment of error, that the court denied Appellants a fair and impartial trial by permitting two Government expert witnesses to testify to material which was irrelevant to proving the conspiracy charge and was irreparably prejudicial to Appellants' defense. Determination of the permissible limits of expert testimony has been left traditionally to the sound discretion of the trial court. *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962); *Bridger v. Union Railway Company,* 355 F.2d 382, 387 (6th Cir. 1966). The scope of this discretion has been broadly construed, and the trial court's actions are to be sustained "unless manifestly erroneous." *Spring Co. v. Edgar,* 99 U.S. 645, 658, 25 L.Ed. 487 (1878). The test for admissibility is set forth in Rule 702 of the Federal Rules of Evidence. To permit expert testimony to be heard by the jury, the trial court must first determine whether the specialized knowledge involved "will assist the trier of fact to understand the [other] evidence or to determine a fact in issue". Then it must satisfy itself that the proffered witness is "qualified as an expert by knowledge, skill, experience, training, or education . . ." Appellate review of such sensitive discriminations by lower courts may only be rationally accomplished on an *ad hoc* basis. *Bridger v. Union Railway Company, supra,* at 388.

■■■ Although our formulation in *Bridger* of the two variables to be weighed in assessing the propriety of expert testimony, 355 F.2d at 387, substantively foreshadows Rule 702 of the Federal Rules of Evidence, we find it to be deficient when applied to criminal cases. It fails to include among the factors to be balanced by the trial court the one which is unquestionably most important from the point of view of the criminal defendant: the potential prejudicial impact of the expert testimony upon the substantial rights of the accused. We share the apprehension voiced by the Ninth Circuit in *United States v. Amaral* that, within the context of a criminal trial, "[s]cientific or expert testimony particularly courts the second danger [of undue prejudice or of confusing the issues or misleading the jury] because of its aura of special reliability and trustworthiness." 488 F.2d 1148, 1152 (9th Cir. 1973). In recognition of the outcome determinative impact of "opinion evidence clothed with the weight of expertise," *Bridger, supra* at 388, we adopt for use in criminal appeals the four criteria proposed in *Amaral* for review of trial court decisions concerning expert testimony: "1. qualified expert; 2. proper subject; 3. conformity to a generally accepted explanatory theory; and 4. probative value compared to prejudicial effect." 488 F.2d at 1153.

When we apply this more stringent standard to the facts of the case before us, we are compelled to reverse Appellants' convictions and to remand the cause for retrial at the discretion of the Government. The record convinces us that the trial court clearly abused its discretion by allowing the Government to introduce extensive expert testimony of both dubious relevance and cumulative prejudicial impact. *See, e. g., United States v. Barnard,* 490 F.2d 907, 913 (9th Cir. 1973). In weighing the delicate balance between the probative value of this testimony and its capacity to engender vindictive passions within the jury or to confuse the issues, we follow the "better approach" recommended by United States District Judge Jack B. Weinstein and Professor Margret A. Berger in their treatise, Weinstein's Evidence ¶ 403[03], at 18. We have attempted to tip the scales in favor of the proponent of the evidence by seeking to maximize its legitimate bearing upon the issues while minimizing its potentially abusive overtones. *See e. g., Abernathy v. United States,* 402 F.2d 582, 584 (8th Cir. 1968).

David W. Parmalee, a Supervisory Chemist for the Drug Enforcement Administration, was the Government's first expert wit-

ness. After qualifying as a laboratory chemist with special expertise in the analysis of controlled substances, Parmalee was permitted to testify to the psychopharmacological properties of DMT. He stated, *inter alia*, that DMT was a Schedule I controlled hallucinogenic drug, physiologically related to psylosydin, mescaline, LSD and MDA because, "[w]hen taken by injection, smoked, or when ingested into the body system, they have a similar hallucinogenic effect." Over defense objections Parmalee defined these "hallucinogenic reactions" as euphoria and as seeing things that are not really there, effects "related perhaps to a nervous breakdown." Parmalee added that other physiological or psychological phenomena induced by the drug included "extremely bad depth perception" and "feelings [emotions] that you [a taker of the drug] might have hidden deep down might come up . . . ." Parmalee testified that, as a Schedule I controlled substance, DMT had no medically recognized use, that "it is dangerous to individuals that use it", and that "it does have a potential for abuse." He then attempted to explain the administrative procedure by which the Food and Drug Administration classified certain drugs as controlled substances, referring repeatedly to the fact that abuse statistics were gathered as material evidence in making this determination.

Parmalee testified that the chemicals found in Green's residence were precursors of DMT, that in his opinion no other substance could be manufactured with them, and that the "recipe" for DMT contained in the booklet found during execution of the search warrant was sufficiently accurate to have enabled Appellants to make the drug. Three times the trial court permitted Parmalee to testify that approximately one-thousand "dosage units" of DMT could have been produced from the quantity of chemicals in Green's possession.

The Government's second expert witness was DEA Agent George Simmons. Simmons was elaborately qualified as an expert by experience in the undercover, illicit purchase of controlled substances. During this extended, preliminary inquiry, the trial court permitted Simmons to describe in great detail the *modus operandi* usually employed in buying drugs on the street. Over the objection of counsel for Green, he listed the many hallucinogens which he had purchased in the course of his career as a law enforcement officer, including LSD, MDA, PCB,[3] and other substances misrepresented as illegal drugs including DMT.

Simmons then testified concerning the mechanisms of supply and demand within the illegal drug market which fixed the street price for a single "dosage unit" of a controlled substance. Over the objections of both Appellants' counsel, he stated that for DMT this price varied in northern Ohio from two to six dollars. He further testified that, if a thousand units were sold in bulk, the unit price might drop as low as seventy cents. On redirect examination the trial court permitted Simmons to tell the jury that on the few occasions in which he had purchased drugs purported to be DMT (he admitted that he had never bought the real drug), chemical analysis revealed that the bogus preparation was, in fact, LSD.

■ We hold that Parmalee's conclusion that the paraphernalia in Green's possession was exclusively applicable to the manufacture of DMT was admissible evidence in the case. We see little probative value, however, in his testimony relating to the threat posed by the drug, its bizarre physiological effects upon the body, the procedure by which it may have been classified as a controlled substance, and its relationship to more notoriously abused compounds such as LSD. While it was permissible for the jury to infer that drugs which the law bans may be both dangerous and susceptible to abuse, the cause of justice was not advanced by the Government's argument to the jury on the particular evil properties of DMT.

---

**3.** Acronyms for several Schedule I controlled hallucinogenic substances found in 21 U.S.C. § 812(c).

Such facts may be highly relevant in assessing the need for controlling the drug, but at trial they did not tend to prove a conspiracy charge. They could only serve to prejudice the jury. For this reason trial courts should exercise greater care in drug cases to screen "background" evidence which may be capable of subliminally inciting or confusing the jury. We hold that the trial court clearly abused its discretion by misapplying Rule 702 of the Federal Rules of Evidence in letting Parmalee testify to this extraneous, prejudicial material. It then failed to rectify its error by curtailing the damaging testimony, *sua sponte*, pursuant to Rules 104(a) or 403 of the Federal Rules of Evidence.

We find even more suspect those portions of both Parmalee's and Simmons' testimony which suggested an economic incentive for Appellants to manufacture DMT. Facts such as the number of dosage units which were theoretically manufacturable from the chemicals found, the anticipated purity of the final product, the street price of a dosage unit, and the details of other illegal drug transactions had no bearing upon Appellants' culpability for conspiracy to manufacture. Drug quantity may be a relevant fact when presented to support an inference of possession with intent to sell or, conversely, to dispel a defense contention that the drug was maintained for personal use. *See e. g., United States v. Nocar*, 497 F.2d 719 (7th Cir. 1974). Estimated street value of the drug may also have probative value in this context. See *e. g., United States v. Blake*, 484 F.2d 50 (8th Cir. 1973). However, the indictment upon which Appellants were tried made no mention of the sale or distribution of DMT.

The Government contends on appeal that the economic evidence was entirely proper as proof of Appellants' criminal intent. This argument fails to do justice to applicable law. The intent which must be proven to sustain a conspiracy conviction is intent to *agree* to do a wrongful act. *United States v. Tyler*, 505 F.2d 1329, 1332 (5th Cir. 1975). The intent required to commit the substantive crime which may be the object of the conspiracy is subsumed within the general conspiratorial intent. In this case, the goal of the alleged conspiracy was the manufacture of a controlled substance as defined by 21 U.S.C. § 841(a)(1). The express language of this statute fails to make specific intent a mandatory element of the crime.[4] Even if specific intent were required, however, the intent in issue would be strictly limited to manufacturing. Congress has not seen fit to distinguish between manufacturing with intent to distribute and manufacturing for personal use. Therefore, we cannot condone the introduction of evidence predicated upon this immaterial distinction, particularly when it serves only to confuse the jury.

Had the Government believed that it had sufficient evidence to prove that Appellants harbored an intent to sell DMT, it could have included in the indictment a second count charging conspiracy to possess with intent to distribute or dispense the drug. As it was, the distribution oriented evidence was so pervasive that it even infected the prosecutor's closing argument to the jury. There the prosecutor went so far as to suggest that Appellants were guilty of a more heinous crime than the inchoate one for which they were on trial:

> Prosecutor: . . . Maybe Mr. Green had a chemical connection, maybe he was going to just sell them this way, but he wasn't. Because he and Mr. Frano were going to turn that box into those thousand doses, and they were going to sell them, and they were going to sell them out in the street. And when you're thinking about this case, think about who were they going to sell them to, and whose money were

---

**4.** The disjunctive form is used to make *scienter* or intent independently sufficient. See text of statute cited in note 1 *supra*.

they going to take and make a profit on it, and who was going to get sick on those chemicals?

We view this invocation of the "dope peddler" image as a highly inflammatory trial tactic which innately prejudiced Appellants' rights to a fair trial. While under other circumstances we might have reversed this case for prosecutorial misconduct, *see e. g., Berryman v. Colbert*, 538 F.2d 1247 (6th Cir. 1976), we conclude that here the prosecutor was actually drawing permissible inferences from *inadmissible* evidence which the trial court had erroneously permitted to come before the jury. As we noted previously, the trial court clearly abused its discretion by not suppressing this evidence in the first instance under Rules 104(a) or 403 of the Federal Rules of Evidence.

▮ We need not consider the sufficiency of the objections made by the defense during the trial to the admissibility of the expert testimony because we are satisfied that the facts support a finding of plain error under Rule 52(b) of the Federal Rules of Criminal Procedure. We hold that the collective evidentiary excesses permitted by the trial court abridged Appellants' Fifth Amendment due process rights. Although the trial court gave what would otherwise have been an exemplary charge to the jury concerning the law of the case, we hold that the extent of the prejudicial testimony was such as to render the curative impact of these instructions nugatory. *See, e. g., United States v. Love*, 534 F.2d 87, 89 (6th Cir. 1976).

Reversed and remanded.