## Richmond

### LACY HAROLD SMITH

### V.

### COMMONWEALTH OF VIRGINIA

June 18, 1982.

Record No. 811158.

Present: All the Justices.

*Dorothy P. Dillon* for appellant.
*Robert E. Bradenham, II, Assistant Attorney General (Gerald L. Baliles, Attorney General,* on brief), for appellee.

STEPHENSON, J., delivered the opinion of the Court.

Lacy Harold Smith appeals the judgment of the trial court approving a jury verdict finding him guilty of selling lysergic acid diethylamide (LSD) and fixing his punishment at 25 years in the penitentiary and a fine of $5,000.* The only question presented is whether the testimony by an analytical chemist regarding the behavior which could result from the use of LSD prejudiced Smith's right to a fair trial.

Danilo Myer, the chemist, testified for the Commonwealth that he examined the substance in question and identified it as LSD. The court then asked Myer what effect LSD had on the human body. After stating he could speak only from what he had researched and learned and not from personal observation, Myer testified, over Smith's objection, as follows:

> In my opinion the lysergic acid diethylamide, LSD, is a very potent drug. Most drugs are given in milligram amounts. Okay. Most drugs like valium, aspirin are given in milligrams . . . which is about a billionth of an ounce. In LSD the concentration that you need to take is one, is micrograms, that's one trillionth of an ounce. That is one hundred

---

* Smith also appeals a conviction for selling marijuana in a quantity exceeding one-half ounce, but not exceeding five pounds, for which he was sentenced to five years in the penitentiary. Finding no error respecting this conviction, we will affirm it.

times more potent that most of your drugs right off the bat. The effect that it actually does, it is called a hallucinogenic and it causes your senses to become very distorted. It can make you do some very erratic things, and it's quite unpredictable in its effects. You may do some very bizarre things. The effects of LSD has been reported to cause a person from, or hallucinogenics in general, I should say, have been, have made people go as far as to tear their eyes right out of their sockets, chew off an arm, jump out of windows, do some really . . . bizarre things.

Smith contends the above testimony was irrelevant to the issue to be determined and only served to inflame and excite the passions of the jury. We agree. *See Lane* v. *Commonwealth*, 223 Va. 712, 292 S.E.2d 358 (1982). The sole issue before the jury was whether Smith sold LSD. Myer was called by the Commonwealth to identify the drug.

Evidence which has no tendency to prove guilt, but only serves to prejudice an accused, should be excluded on the ground of lack of relevancy. For evidence to be admissible it must relate and be confined to the matters in issue and tend to prove an offense or be pertinent thereto. Evidence of collateral facts or those incapable of affording any reasonable presumption or inference on matters in issue, because too remote or irrelevant, cannot be accepted in evidence.

*Bunting* v. *Commonwealth*, 208 Va. 309, 314, 157 S.E.2d 204, 208 (1967).

The General Assembly has divided drugs and narcotics into a number of schedules. Code § 54-524.84:1 *et seq.* Among the factors considered in making this classification are:

(1) The actual or relative potential for abuse;
(2) The scientific evidence of its pharmacological effect, if known;
(3) The state of current scientific knowledge regarding the substance;
(4) The history and current pattern of abuse;
(5) The scope, duration, and significance of abuse;
(6) The risk to the public health;

(7) The potential of the substance to produce psychic or physiological dependence liability . . . .

Code § 54-524.84:1(a). The manufacture, possession and distribution of these scheduled substances are proscribed, and the punishment for violators varies from schedule to schedule. Code §§ 18.2-248, 250.

This classification having been made and the range of punishment established, the jury should not concern itself with background information on the substance, but should make an objective finding of guilt or innocence based on relevant evidence and punish the guilty within the limits fixed by statute. To permit evidence respecting extreme horrors which may result from the use of illegal substances diverts the jury from its principal inquiry and injects an element of passion into the trial prejudicial to the accused.

In *United States* v. *Green,* 548 F.2d 1261 (6th Cir. 1977), the defendant was charged with conspiracy to manufacture dimethyltryptamine (DMT). The trial court permitted the government's analytical chemist to testify regarding the scheduling of DMT and its effect on the human body. Holding the trial court abused its discretion by admitting this evidence, the court said:

We see little probative value, however, in his testimony relating to the threat posed by the drug, its bizarre physiological effects upon the body, the procedure by which it may have been classified as a controlled substance, and its relationship to more notoriously abused compounds such as LSD. While it was permissible for the jury to infer that drugs which the law bans may be both dangerous and susceptible to abuse, the cause of justice was not advanced by the Government's argument to the jury on the particular evil properties of DMT. Such facts may be highly relevant in assessing the need for controlling the drug, but at trial they did not tend to prove a conspiracy charge. They could only serve to prejudice the jury. For this reason trial courts should exercise greater care in drug cases to screen "background" evidence which may be capable of subliminally inciting or confusing the jury.

*Id.* at 1269-70.

For the reasons stated, we hold the evidence of which Smith complains was irrelevant and prejudicial. Accordingly, his conviction for selling LSD will be reversed and the case remanded for a new trial consistent with the view expressed herein.

*Affirmed in part;*
*reversed in part;*
*and remanded.*

RUSSELL, J., dissenting.

A Virginia jury bears an awesome responsibility in a criminal case. After discharging a jury's usual duty of determining guilt or innocence, it must, if it has found the defendant guilty, fix the punishment to be imposed by the court in the same deliberation, without further evidence or instructions. *Johnson v. Commonwealth,* 208 Va. 481, 158 S.E.2d 725 (1968).[1] The range of its options in determining punishment is often very wide. In this case, the jury might have imposed any sentence from five to forty years, in addition to a fine. Code §18.2-248. This task must usually be addressed without any evidence as to the defendant's prior behavior, personal traits, health, educational level, job prospects, family ties, and social relationships. The jury is given no information as to the effect or availability of probation, parole, time allowances for good behavior, suspended sentences, rehabilitative programs, or pardons. *Hinton v. Commonwealth,* 219 Va. 492, 247 S.E.2d 704 (1978). Unless the defendant chooses to testify, the jury will probably have to fix his punishment without knowing whether he had a serious past criminal record, or had led an exemplary life. A judge would weigh most of these factors very carefully before imposing sentence in a non-jury case. *See* Code §19.2-299.

If the jury asks about these matters, as it often does, it is told to impose such sentence as it finds justified by the evidence, and not to concern itself with what might happen afterwards.[2] The theory of our unitary jury trial is that the jury is to sentence the offense

---

[1] For a discussion of jury sentencing in Virginia, see Note, *Jury Sentencing in Virginia,* 53 Va. L. Rev. 968 (1967).

[2] Instruction No. 4 of *VIRGINIA MODEL JURY INSTRUCTIONS—CRIMINAL* I-25 (Supp. #2, 1981) states: "If you find the defendant guilty, you should impose such punishment as you feel is just under the evidence and within the instructions of the Court. You are not to concern yourselves with what may happen afterwards."

rather than the offender. The factors mentioned above, relating to the defendant's personal life, are taken into account by the trial judge and the executive branch of government in the defendant's later treatment, but are not the jury's concern.[3]

How, then, is the jury to choose the appropriate punishment in a case such as this? Would five, ten, or forty years be appropriate? The answer can only be found in weighing the comparative seriousness of the offense, as disclosed by the evidence. In an armed robbery case, for instance, punishable by imprisonment from five years to life (Code §18.2-58), the jury should consider whether the defendant's weapon was loaded with live ammunition, or blanks, or was unloaded, or was in fact a toy pistol. The degree of potential danger to victims and bystanders should make a substantial difference in the relative severity of punishment.

The logical extension of the majority's view would deprive the jury of the most significant evidence bearing upon its sentence decision. Is the jury not to know whether the robber's gun was loaded? The mere inclusion of LSD within Schedule I by Code §54-524.84:4 hardly ends the inquiry. That schedule also contains heroin, hashish oil, and until 1979, contained marijuana.[4]

Few would argue that all of the drugs in Schedule I are equal in their dangerousness. If they were, there would be little purpose in the wide range of penalties provided by the General Assembly. The relative peril to the community presented by the drug itself, along with the quantity involved and the relative age and sophistication of the victims, should all be considered by the jury in determining the appropriate sentence.

---

[3] It may well be argued that the jury's role now differs markedly from that envisioned by the General Assembly which first instituted jury sentencing for felonies in 1796. Va. Rev. Code, ch. 200, §15, at 357 (1803). The census of 1790 reveals that Richmond, then the largest population center, had 878 free white males over 16 years of age. (Jury service was limited to such of these as were over 21 years of age, a group even less numerous.) Alexandria follows, with 734, then Petersburg, with 583. Considering the small size of the communities from which juries were drawn, and the difficulty and infrequency of travel in the 18th century, the framers of this legislation could well have expected the jurors to have intimate personal knowledge of each defendant's circumstances and past record, and to take this into account in fixing punishment. Today, it is highly unlikely that such well-informed jurors would be encountered, particularly in urban areas. Those who appear will usually be excused, either by strikes or by challenges for cause.

[4] It also contains peyote, which the Supreme Court of California held, in *People* v. *Woody*, 61 Cal.2d 716, 394 P.2d 813, 40 Cal. Rptr. 69 (1964), may not constitutionally be denied to Indians who use it for allegedly religious purposes.

The chemist's testimony may have been hyperbolic, partly inaccurate, or flatly untrue. If so, the remedies of cross-examination, contradiction by opposing evidence, and closing argument are always available. They have served the truth-determining process well for centuries, and may be relied upon here.

I think the trial judge correctly admitted the evidence as to the effect of LSD on the body, and would affirm.

THOMPSON, J., joins in dissent.