888 F.2d 128
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Sidney I. BRICKNER, Defendant-Appellant.
 No. 89-1228.
 United States Court of Appeals, Sixth Circuit.
 Nov. 2, 1989.
 
 Before NATHANIEL R. JONES and RALPH B. GUY, Jr., Cirucit Judges, and WILLIAM O. BERTELSMAN, District Judge.*
 PER CURIAM.
 
 
 1
 Defendant, Sidney Brickner, appeals his jury conviction for conspiracy to possess with intent to distribute and conspiracy to distribute controlled substances, in violation of 21 U.S.C. Secs. 841(a)(1) and 846. On appeal, Brickner argues that there was an error in the court's jury instructions, that a mistrial should have been declared as a result of the government's alleged violation of a discovery order, and that prosecutorial misconduct denied the defendant a fair trial. Although we will address these issues seriatim, we find them to be meritless and will affirm the conviction.
 
 I.
 
 2
 Edith Lee, a physician and codefendant in this case, was the central figure in a "script mill" responsible for thousands of prescriptions for controlled substances being issued outside the course of legitimate medical practice. Buyers would provide Dr. Lee with the names of relatives or friends to be used on the prescriptions. None of these persons were ever patients of Dr. Lee, nor were they ever seen by her. Buyers would pay a fee for each prescription issued; the fee varied depending on the drug involved. The prescriptions were then filled at a number of different cooperating pharmacies. Brickner, a pharmacist, was involved with two of the pharmacies that filled a great number of these prescriptions. Brickner worked at both Franklin Pharmacy and Neuhoff Drugs and was treated as a partner, although his wife was shown as the owner of seventy-five percent of Franklin, and his son Neil was shown as a seventy percent owner of Neuhoff. Neil Tubben owned the remaining interest in both stores.
 
 
 3
 On August 1, 1986, FBI agents executed a search warrant at Neuhoff Drugs and seized a number of records, including prescriptions written by Dr. Lee. During the search, Brickner admitted to an FBI agent that he knew several of the persons who had brought him the bogus prescriptions.[1] He also admitted that when he filled the prescriptions, he knew the persons who presented the prescriptions were not ill and were not taking the medications themselves.[2] Brickner and sixteen other persons were subsequently indicted. Only Brickner and three codefendants went to trial, and all were convicted.
 
 II.
 A. The Jury Instructions
 
 4
 Brickner was charged with conspiracy. As part of the conspiracy count, the indictment alleged:
 
 
 5
 It was further part of said unlawful conspiracy that SIDNEY BRICKNER, R.PH., filled prescriptions illegally written by EDITH LEE, M.D., at Neuhoff Drugs, knowing the same to have been issued outside the course of legitimate medical practice.
 
 
 6
 (App. 009).
 
 
 7
 The underscored language is not taken from the statute which simply makes it an offense to manufacture, distribute, or dispense, a controlled substance without authority.[3] The defendant contends that because the jury instructions did not specifically use the words "knowing the same to have been issued outside the course of legitimate medical practice," they are fatally defective. We disagree.
 
 
 8
 We first note that defendant made no objection to the jury instructions and thus is precluded from claiming error on appeal. Fed.R.Crim.P. 30.[4] We are at liberty under Fed.R.Crim.P. 52(b) to notice "plain error," but only in instances where the instructions were so egregiously erroneous that a miscarriage of justice likely resulted. United States v. Piccolo, 723 F.2d 1234, 1241 (6th Cir.1983) (en banc), cert. denied, 446 U.S. 970 (1984).
 
 
 9
 In reviewing Judge Gilmore's instructions, we find no error, plain or otherwise. The jury instructions informed the jury that:
 
 
 10
 A pharmacist may not be convicted when he dispenses controlled substances in good faith to customers in the regular course of professional practice. In order to obtain a conviction, the Government must prove beyond a reasonable doubt that the Defendant Pharmacist did knowingly and intentionally distribute controlled substances, and did so other than in good faith and in accordance with a standard of pharmacy practice generally recognized and accepted in the United States. The Defendant may not be convicted if he merely made an honest effort to fill prescriptions in compliance with an accepted standard of pharmacy practice.
 
 
 11
 A controlled substance is dispensed by a pharmacist in the usual course of professional practice, and therefore lawfully, if it is dispensed by him in good faith. Good faith means good intentions and honest exercise of the best professional judgment as to a customer's medical needs. It connotes an observance of conduct in accordance with what the pharmacist should reasonably believe to be proper pharmacy practice.
 
 
 12
 (App. 358). The instruction later stated:
 
 
 13
 Federal law authorizes, as I said before, a practitioner to dispense controlled substances if the drug is prescribed for a legitimate medical purpose by a physician acting in the usual course of professional practice. A valid prescription is one which is issued for a legitimate medical purpose by a physician acting in good faith in the usual course of professional medical practice.
 
 
 14
 An order purporting to be a prescription but not issued by a physician in the usual course of professional treatment or in legitimate and authorized research is not a prescription under the law, and a pharmacist knowingly filling such a purported prescription is in violation of the provisions of the law relating to controlled substances.
 
 
 15
 (Tr. XV at 1641-42).
 
 
 16
 In addition, the district judge gave defendant's "theory of the case" instruction which contained Brickner's denial of filling "any prescriptions written by Dr. Lee knowing it was issued outside the course of legitimate medical practice." (Tr. XV at 1627).
 
 
 17
 The court also instructed the jury that this was a specific intent crime and defined the scienter requirement necessary to establish specific intent. In our view, the instructions, taken as a whole, give the jury a clear understanding and are fairer to the defendant than if the court had simply used the language now urged by the defendant.
 
 
 18
 B. The Alleged Violation of a Discovery Order
 
 
 19
 Although the defendant did not testify at trial, he did put on two defense witnesses. One of these witnesses, defendant's son Howard, testified that Neil Tubben told both Howard and the defendant that Dr. Lee's prescriptions were legitimate. Although Tubben appears to have been involved in this whole affair, he was neither indicted nor called as a witness in the government's case in chief. The government did call Tubben as its only rebuttal witness. Tubben testified that he was defendant Brickner's partner in both Franklin Pharmacy and Neuhoff Drugs. Tubben stated that he was aware that both stores filled an unusual number of prescriptions for Schedule II controlled substances, most frequently written by Dr. Lee. He further testified that he had discussed with Sidney Brickner and Brickner's son Neil that there was no medical purpose for the prescriptions, but that defendant told him to fill them as long as Dr. Lee had a valid medical license and verified that she wrote the prescriptions. Tubben testified that defendant threatened him with "economic sanctions" unless he continued to fill Dr. Lee's prescriptions. In support of this latter allegation, the government offered Exhibit 148, a note written by Brickner to Tubben.[5] Brickner's counsel sought a voir dire solely to question Tubben on the authenticity of the note; i.e., could Tubben establish that Brickner actually wrote the note. After voir dire, the court overruled defendant's authenticity objection. The note was then read by Tubben to the jury, but was not published to the jury. No objections were made.
 
 
 20
 During cross-examination of Tubben, inquiry was made as to when Tubben first made the government aware he had this note. Tubben indicated he had just given the note to the government attorney within the last week but had mentioned the note to an FBI agent six weeks to two months earlier. On the basis of this response, Brickner's counsel moved for a mistrial, claiming the note should have been turned over to him as part of discovery. Upon being questioned by the court, the assistant United States attorney indicated that she did not learn of the existence of the note until the trial was well underway; that she did not plan to call Tubben or introduce the note in the government's case in chief; and that she called the witness in rebuttal only because of the nature of Brickner's defense.
 
 
 21
 Judge Gilmore took the matter under advisement and ultimately denied the motion for a mistrial.[6] He did strike the exhibit and gave the jury a lengthy cautionary instruction.
 
 
 22
 Although defendant argues at length about discovery abuses and the ineffectiveness of cautionary instructions, we find it unnecessary to discuss these arguments in detail.
 
 
 23
 To begin with, contrary to the defendant's assertion and the trial judge's implications, we find the calling of Tubben and the offering of the note to have been proper rebuttal. The government is not privy to what defense a defendant will offer or rely upon, if any, until it has rested its case. Here, the government had no way of knowing that Brickner, through his son, would attempt to shift blame to Tubben. Although the government had the note a few days before trial and professed negligence in not making it available earlier, it did not, in fact, violate any specific discovery order, nor did it withhold exculpatory material.[7] The court offered defense counsel an adjournment, but this offer was declined. The defense wanted a mistrial or nothing. Given that the note itself clearly was admissible, no prejudice occurred from the jury hearing the note read, notwithstanding the crude language it contained. We can find no discovery abuse which would have merited the granting of a mistrial.
 
 C. Prosecutorial Misconduct
 
 24
 The principal prosecutorial misconduct alleged is the introduction of the note just discussed. The defendant also cites to four other alleged acts of misconduct. First, defendant claims the government injected the spectre of organized crime into the case by mentioning the word "Mafia" in closing argument. The relevant portion of the argument follows:
 
 
 25
 There are some things that conspiracy is not, and I don't want to belabor them but I want you to understand that a conspiracy does not require the proof of a formal organization. Conspiracies aren't corporations. You don't go to the Secretary of State's Office and file Articles of Conspiracy. There may be formal organizations which are criminal conspiracies, the Mafia might be an example or a labor racketeering organization, but it isn't required. We don't have to prove a chain of command or specialized roles or chains of communication. It can be a looser organization than that. We don't have to prove, for example, that any particular Defendant knew all the other members of the conspiracy. That isn't necessary. You don't have to know the big picture, all you have to know is that you are combining with one or more persons to accomplish an unlawful purpose. It isn't necessary that we prove that any one individual Defendant knew all of the means or instruments by which the unlawful purpose is to be accomplished. Again, all we have to prove is that that person knowingly and intentionally combined with at least one other person to accomplish at least some illegal purpose. It isn't necessary for a finding of guilty on a conspiracy count that we prove that any particular Defendant played the central role or a major role or a leadership role, any role whatever, however modest it might be if it was knowingly and intentionally undertaken with the purpose of accomplishing the illegal aims of the conspiracy.
 
 
 26
 (App. 350-51). Although a more appropriate (or at least safer) example might have been chosen, we find no error resulting from the "Mafia" reference.
 
 
 27
 Second, in closing argument, the prosecutor drew certain inferences from the testimony, one involving an imaginary conversation that might have occurred. We find no error in the remarks made nor do we see how any prejudice possibly could have resulted to the defendant.
 
 
 28
 Next, defendant claims it was improper for a witness, Mary Watkins, to refer to Larry Williams, one of Brickner's codefendants, as a "crack-head." As the district judge noted, however, in overruling a defense objection and motion for mistrial, Williams' attorney had opened the door to this subject by asking the witness whether she "liked" Williams and whether he had come to her house. In response to questions by Williams' attorney, Watkins had already testified she did not like Williams because she found out he was "using"; that she would not let him in her house; and that "[n]o junkie is to come in my house." The prosecutor's question on redirect was intended to establish that Williams came to Watkins' house and to explain why he was not permitted inside. No unfair prejudice can be said to have occurred in a case in which the witness was asked to explain answers already elicited by defense counsel.
 
 
 29
 The last alleged act of prosecutorial misconduct was the calling of an expert witness, Dr. Berger, by the government. Berger's testimony related to the pharmacological effects of the drugs being illegally sold by the defendant.[8] In alleging error, the defendant primarily relies on United States v. Green, 548 F.2d 1261 (6th Cir.1977), in which this court held that expert testimony on the effects of DMT, an hallucinogen, was "of both dubious relevance and cumulative prejudicial impact." Id. at 1268. Green is clearly distinguishable from this case. In Green, the defendants were charged with conspiracy to manufacture DMT, and the effect of the drug on users had no probative value to anything the government had to prove to establish the offense. Such is not the case here. Brickner's codefendant, Dr. Lee, had structured her defense around the suggestion that she was prescribing these drugs as legitimate treatment for persons addicted to street drugs. Dr. Berger's testimony was relevant to explain that none of the drugs Dr. Lee was prescribing were properly used to treat addicts. Also, by explaining the properties of and medical indications for the drugs, he demonstrated that Dr. Lee had acted "outside the course of legitimate medical practice" when she prescribed addictive drugs without physical examinations or follow-up on the patients. Further, the testimony tended to demonstrate Brickner's guilty knowledge, as it established that drugs such as Dilaudid and Percodan are rarely prescribed and would not likely be presented at a pharmacy in the volume seen at Neuhoff Drugs.
 
 
 30
 This was not a case in which the drugs were gratuitously discussed merely to influence the jury. The testimony was relevant and appropriate.
 
 
 31
 AFFIRMED.
 
 
 
 *
 Honorable William O. Bertelsman, United States District Court for the Eastern District of Kentucky, sitting by designation
 
 
 [1]
 The individuals that Brickner admitted knowing testified for the government at trial
 
 
 [2]
 Although on appeal Brickner denies making these statements, he did not testify at trial, and the testimony of the FBI agent stands unrefuted, except for the testimony of Brickner's son. His son said he was present when the search warrant was executed, and he did not see his father talking to an FBI agent
 
 
 [3]
 Title 21 U.S.C. Sec. 841(a)(1) reads:
 (a) Except as authorized by this subchapter, it shall be unlawful for any p erson knowingly or intentionally--
 (1) to manufacture, distribute, or dispense, or possess with intent to manu facture, distribute, or dispense, a controlled substance....
 Title 21 U.S.C. Sec. 846 is the conspiracy counterpart of section 841.
 
 
 [4]
 Federal Rule of Criminal Procedure 30 reads in relevant part:
 No party may assign as error any portion of the charge or omission therefro m unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection.
 
 
 [5]
 The note read in pertinent part:
 Goddammit Neal if you think that you will arbitrarily just fill a few get y our fucken ass out. Why do you turn down Dr. Lee. I should leave you shit cocksucker. You were pretty fucken fast to come here and pick up this mon ey. Why can't you get your lazy ass her (sic) on time to do business. You had better get things straight soon and now.
 (App. 31).
 
 
 [6]
 The trial judge devoted considerable time to the mistrial motion, and he even called the FBI agent involved to testify. All of these proceedings, of course, took place with the jury excused
 
 
 [7]
 The U.S. Attorney's Office in Eastern Michigan operates essentially under an "open file" policy, and Judge Gilmore assumed they were following their usual policy in this case
 
 
 [8]
 Dr. Berger was primarily called to testify to other matters about which no objection is made