IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 19, 2011 Session

**STATE OF TENNESSEE v. SANDY L. BINKLEY**

**Direct Appeal from the Criminal Court for Sumner County**
**No. CR63-2009    Dee David Gay, Judge**

_____

**No. M2010-00486-CCA-R3-CD - Filed August 23, 2011**

_____

A Sumner County jury convicted the Defendant, Sandy L. Binkley, of two counts of statutory rape by an authority figure.  The trial court sentenced the Defendant to six years in prison for each conviction and ordered the sentences to be served consecutively, for a twelve-year effective sentence.  On appeal, the Defendant contends that the trial court erred: (1) when it excluded testimony from her expert witness; and (2) when it improperly sentenced her to the maximum sentence within her range and improperly imposed consecutive sentences.  After a thorough review of the record and applicable authorities, we conclude the trial court properly excluded the expert's testimony and also properly sentenced the Defendant.  We, therefore, affirm the trial court's judgments.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JERRY L. SMITH, J., joined.  DAVID H. WELLES, Sp. J., not participating.

David Ridings and Jason Elliott, Goodlettsville, Tennessee, for the Appellee, Sandy L. Binkley.

Robert E. Cooper, Jr., Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; Sallie Wade Brown, Assistant District Attorney General, for the Appellant, State of Tennessee.

**OPINION**
**I. Facts**

    A Sumner County grand jury indicted the Defendant, a high school teacher, for six counts of statutory rape by an authority figure for her alleged sexual interactions with three

of her male high school students, C.B., B.B., and J.H.[1]  At the conclusion of the Defendant's trial, the jury acquitted her of four of the counts, which involved two of the three alleged victims.  It convicted her of two counts, which involved the third victim.

## A. Facts Presented at Trial

The Defendant does not appeal the sufficiency of the evidence supporting her conviction, so we will summarize the testimony supporting her convictions in the light most favorable to the State.

C.B. testified that he became acquainted with the Defendant, a teacher at his high school, when his brother, B.B., began taking her geometry class.  B.B., who was a year younger than C.B., told C.B. that he and the Defendant had engaged in sexual intercourse.[2]  C.B. said he was in eleventh grade at the time and that, in the following year, during his senior year in high school, he served as the Defendant's teacher's aide every day during the second period class.  The Defendant had to leave her classroom during this period, because she shared the classroom with another teacher, so she and C.B. usually would spend the period together, playing basketball, working out, or walking together.  They often retrieved the keys to the volleyball locker room from another teacher, Ginger Lesemann, who was also the athletic director, and changed into their gym clothes in the girls' volleyball locker room.  On occasion, C.B. would go into other gym classes and interact with those students.  When C.B. and the Defendant interacted, they talked about their relationships, the Defendant disclosing that she and her husband were having a hard time, which she said might lead to her divorcing him.

C.B. and the Defendant began sending each other text messages.  These messages were, at first, not sexual in nature and were primarily about whether C.B. would be at school.  This changed, however, one night when C.B. and the Defendant were both at a basketball game.  The Defendant texted C.B. that she was counting money, and C.B. "flirt[ed]" with her by sending her a text picture of himself with his shirt off trying to "distract[]" her.  The text messages between the two continued and were sometimes, but not often, flirty in nature.

C.B. realized that the Defendant was interested in him one day when the two were playing basketball together.  C.B. recalled the Defendant giving him "a flirty little nudge" during the game, after which he "caught on to what was going on."  A few weeks later, in

---

[1]To protect the victims' privacy, we will refer to them by their initials only.

[2]We have omitted further details about B.B.'s allegation that he engaged in sexual intercourse with the Defendant because the jury acquitted the Defendant of this charge.

March 2008, while C.B. was seventeen and acting as the Defendant's teacher's aid, the two went into the girls' volleyball locker room where they had sexual intercourse. The other gym students were not present at the time because they were undergoing physical exams conducted by other teachers. The two entered the locker room, and the Defendant set down her bag. The Defendant asked C.B. what he wanted to do that day, and he told her they could play basketball. The Defendant reminded him they had the whole gym to themselves and asked him again what he wanted to do. C.B. said, "[W]ell, we can do something bad." The Defendant then walked toward him and straddled him and said "like what do you mean by that?" The two then began to kiss, and the Defendant asked C.B. if he "really wanted to do this." C.B. said, "[S]ure, why not?"

The Defendant began performing oral sex upon C.B. He asked her if she wanted him to turn out the lights, and she said, "Yes." When he returned from turning off the light, the Defendant had removed her pants and panties, and the Defendant had laid down on a desk in the office area of the locker room. C.B. said that he then sexually penetrated her. The Defendant said, "[T]his isn't what I expected whenever you signed up as my teacher's aide." C.B. did not wear a condom during this interaction, and he ejaculated inside the Defendant. C.B. said he felt comfortable doing so because the Defendant told him that she had had her "tubes tied."

After C.B. ejaculated, the Defendant grabbed a towel and went into an adjacent bathroom. C.B. located his cell phone and took a picture of his shoes next to the Defendant's panties, which were both lying on the floor near the desk. C.B. then took the Defendant her clothes, and, as the two left the volleyball office together, she told him that "[a]bsolutely no one" could know about their sexual encounter. C.B. later showed this picture to two of his friends, Lennon Brooks and Derek Meadows. C.B. denied that he forced the Defendant to have oral sex with him or that he forced her to have sexual intercourse with him. C.B. said the two remained friends after their sexual encounter. In April 2008, when C.B. turned eighteen, the Defendant gave him a card containing a $100 bill. Derek Meadows, who testified that he was present when C.B. opened this card from the Defendant, confirmed that the card, in fact, contained a $100 bill. Meadows said the Defendant had written on the card that she had enjoyed C.B. being her teacher's aide and that he should not spend the money all in one place.

Robin Venable, assistant principal at Portland High School, first became acquainted with the Defendant when the Defendant was a student at the high school. The Defendant later became a teacher at the high school while Venable was the assistant principal. The school resource officer, Scott Martin, discussed with Venable the fact that the interactions between the Defendant and C.B. looked inappropriate. He said he had never seen a teacher and a student walk side by side or interact in a manner similar the Defendant and C.B.

Assistant Principal Venable and Resource Officer Martin discussed that the the Defendant and C.B. would go into the weight room alone together, play basketball alone together, walk closely to one another while talking, and lean against a wall alone and talk. They discussed that this did not look good, but Venable did not think more of it because she had known the Defendant for such a long time. One day, the Defendant came to Venable and told her that rumors were going around the high school about the Defendant and C.B. Venable told the Defendant to speak with Principal Gideon, who handled these matters, and advised the Defendant to not put herself in a position where rumors would start. The Defendant never reported to Venable that she had been raped. The Defendant did, however, speak to Principal Gideon to "assure [him] that any rumors that [he] had heard concerning her and any relationship with a student w[ere] untrue."

Several of the Defendant's fellow teachers testified at trial that the Defendant spoke with them about rumors that she and C.B. were involved in an inappropriate relationship. April Spears, a fellow high school teacher, said that she had heard from students that the Defendant was involved in an inappropriate sexual relationship with C.B. In May 2008, the Defendant came into Spears's classroom while a student was present in Spears's classroom. In the student's presence, the Defendant told Spears about the rumors about her and C.B. She proceeded to tell Spears that she was present with C.B. when he was talking on his cell phone to his ex-girlfriend and that she told C.B. to "tell that bitch to shut up and quit spreading rumors about her." Spears was "surprised" by the language that the Defendant used, particularly with a student in the room.

Kim Meadows, a teacher and lifelong friend of the Defendant, said the Defendant told her around February of 2008 that she was upset about rumors that she and C.B. were involved in a sexual relationship. The Defendant told Meadows that she thought C.B.'s ex-girlfriend was responsible for the rumors. In March 2008, the Defendant told Meadows that she and her husband were going to separate but that they were waiting to do so until after their twin daughters' birthday in April. Meadows, who saw the Defendant and C.B. together, described their relationship as "flirtatious." Meadows confirmed that the Defendant had her "tubes tied" after the birth of her son and that she had breast augmentation surgery in the summer of 2008.

The Defendant spoke with another teacher, Barbra Dorris, with whom she worked during the third period of the school day, the period after C.B. worked as the Defendant's aide. Dorris said she and the Defendant discussed that the Defendant and C.B. spent the second period together, either going to the weight room or playing football or basketball. Dorris said the Defendant talked about C.B. "[v]ery frequently" and made comments about how C.B. looked "hot when he didn't have his shirt on." The Defendant also told Dorris that she occasionally saw C.B. and his family at a local gym at night after school. The Defendant

said C.B.'s mother gave her the "evil eye" and that the Defendant would not talk to C.B. at the gym. Dorris said, one day after school, the Defendant came up to Dorris while Dorris's ten-year-old daughter was with her. In front of Dorris's daughter, the Defendant asked Dorris if Dorris had heard rumors that the Defendant and C.B. had engaged in a sexual affair. Dorris, who was concerned about her daughter, told the Defendant she had not heard anything and walked away.

Amanda B., C.B.'s step-mother, testified that, before graduation, she heard a rumor that C.B. and the Defendant had engaged in an inappropriate relationship. She told her husband and C.B.'s father, Christopher B., who confronted C.B. about the rumors. C.B. denied that he and the Defendant had engaged in sexual intercourse, and Christopher B. told C.B. to distance himself from the Defendant.

At some point before C.B.'s graduation, the Defendant asked him what he wanted from her as a present. He told her that what he wanted was too expensive. She pressed him, and he told her he wanted an Xbox 360, valued at around $550. Shortly before he graduated, she told him that she had his present in her closet at her home and that he needed to come and get it before her husband found it. The two agreed to meet at the funeral of C.B.'s friend. C.B. arrived at the funeral with his brother, B.B., and the Defendant arrived separately. She handed him the receipt and the Xbox and told him that she had also purchased for him the two-year warranty. The State presented this receipt, signed by the Defendant, for the purchase of the Xbox on May 15, 2008. Kim Meadows testified that the Defendant told her that she gave C.B. money for an Xbox as a graduation gift.

During the summer of 2008, C.B. and the Defendant continued to text each other, and, at one point, the Defendant asked when she was going to see him again. C.B. told her he was not doing anything the following day, and the Defendant invited him to her house. The two sat down on the couch together, and the Defendant told him about the breast augmentation surgery that she had recently undergone. C.B. asked to see the Defendant's breasts, and the Defendant showed him her breasts. The two then talked about how good her breasts looked. C.B., becoming nervous, asked the Defendant where her husband and children were, and the Defendant informed him that they were at church. The two began "making out," and the Defendant performed oral sex upon C.B. in attempt to get him aroused. C.B. testified that, because he felt he should not be there, he was unable to become erect. He went into the Defendant's daughters' bedroom to attempt to arouse himself. At one point, C.B. sexually penetrated the Defendant, but said he could not finish having sexual intercourse with her because it did not feel "right." C.B. and the Defendant talked for a short time, and C.B. prepared to leave. The Defendant asked when she would see him again, and C.B. said he did not know. The Defendant asked C.B. to send her a picture of him every day until the two saw each other again. C.B. said he sent the Defendant only one picture.

At some point after his graduation, C.B. told his parents about his sexual encounter with the Defendant in the office of the volleyball locker room. He sought his parents' advice because the Defendant would not leave him alone, and she continued to text him and contact him. C.B. became concerned because he knew that she was married. At the time C.B. sought his parents' advice, however, he had already turned eighteen. Because he was over eighteen, his parents did not report the Defendant's conduct to police.

On September 23, 2008, B.B. and his father got into an argument, which resulted in his stepmother, Amanda B., taking B.B.'s cell phone from him in the morning before he left for school. After B.B. left for school, B.B.'s stepmother noticed that a text message from a "Mary J." was received on the phone that read, "Where the heck are you?" She became concerned because B.B. should have already been at school, so she called the school attendance clerk and verified that he was present. A few minutes later, another text came through to the phone that read, "I'm going to have to mark you absent. You have a meeting coming up." Amanda B. called the number for "Mary J." and got the voice mail of the Defendant, whom she knew to be a teacher at her sons' school. Amanda B. immediately became concerned because her other stepson, C.B., had previously told her that he had engaged in sexual intercourse with the Defendant.

Amanda B. called the school attendance clerk again and learned that, while B.B. had been marked present, he actually did not arrive at school until the second period of the school day. The attendance clerk informed her that B.B. did, in fact, have a meeting later that day as part of his election to the homecoming court. School officials asked her and her husband, Christopher B., to come to the school to discuss the matter with them. When Amanda B. and Christopher B. met with school officials, including the principal, Bob Gideon, and the school resource officer, Martin, they showed them the text messages on the phone, and the principal verified that the phone number belonged to the Defendant. Amanda B. and Christopher B. expressed their concern about B.B. being an aide for the Defendant and asked that he be removed as her aide. Amanda B. and Christopher B. then informed Principal Gideon that C.B. told them that he had engaged in sexual intercourse with the Defendant.

Per protocol, Principal Gideon contacted the Assistant Director for Human Resources for Sumner County to inform him of the allegations concerning the Defendant. The assistant director told him to contact law enforcement, which Principal Gideon did. Thereafter, Detective Joey Rush and Detective Stan Jones arrived, and, after the officers met with Amanda B., Christopher B., Principal Gideon, and Resource Officer Martin, they told Amanda B. and Christopher B. not to speak with B.B. or C.B. about the situation until officers told them it was safe to do so.

The detectives interviewed B.B., C.B., and the Defendant. B.B. denied that he had ever engaged in any sexual activity with the Defendant. C.B. told the officer that he had engaged in sexual intercourse with the Defendant in the volleyball locker room office. C.B. initially told police that he helped pay for the Xbox the Defendant purchased for him, explaining that the Defendant told him to say as much if anyone asked why she bought him an Xbox. He clarified that the truth was that he had, in fact, not given her any money for the Xbox.

Resource Officer Martin informed the Defendant on September 23, 2008, that police officers wanted her to come to the police station and speak with them. Before leaving with Martin, the Defendant gave her cell phone to a student and told the student to give it to Kim Meadows, another teacher whom the Defendant had known since they attended third grade together. The student did so, telling Meadows that the Defendant told her that she would explain everything to Meadows at a later date. Meadows tried to find the Defendant after school to give her back the cell phone. Later that evening the Defendant, who was very upset, called her and asked her to leave her phone on the Defendant's desk at school, so she could retrieve it when she cleaned out her classroom.

Detective Rush interviewed the Defendant, who was thirty-six years old at the time. A videotape of that interview was played for the jury. For the first few hours of the interview, the Defendant adamantly denied ever engaging in any sexual activity with C.B. Detective Rush, using a law enforcement tactic of turning a suspect into a victim, asked the victim whether C.B. raped her. At that point, the Defendant then agreed that she had engaged in sexual intercourse with C.B. but that she had only done so because he raped her.. The Defendant also submitted the following written statement:

> The Friday before spring break, March '08, C.[B]. and I had been in the volleyball office. The door was open. I was grading some papers. The next thing I knew he was kissing me. I told him, no, we can't do this. The next thing I knew he was taking my pants off and my panties. He complimented, they were cute. I was trying not to focus on what was happening. He forced me to give him oral sex and then put me on the desk and proceeded to have sex. I don't know if he ejaculated or not. When he got up, I got my clothes and went to the bathroom to get dressed. I'm not sure where he went after that.

Detective Rush continued his investigation and interviewed several people at the school, including J.H. and several other students. Lennon Brooks, one student interviewed, testified he had been best friends with C.B. for seven years and that the two had been friends while attending high school. Brooks recalled C.B. receiving "suggestive" text messages from

the Defendant. To Brooks, the messages seemed to be leading up to C.B. and the Defendant engaging in some kind of sexual activity, because they were becoming more suggestive. C.B. sent Brooks a text picture of a pair of panties and a pair of shoes with a message attached that indicated that C.B. and the Defendant had engaged in sexual intercourse.

Another friend of C.B., Derek Meadows, testified that he also had the Defendant's cell phone number, which he would use to text her if he was going to be late to school. He said that the Defendant spoke to him about the relationship between C.B. and C.B.'s then girlfriend, Kelsey. The Defendant told Meadows that Kelsey gave her an "evil look" when the two ran into each other at the gym.

On September 26, 2008, detectives again interviewed C.B., B.B., and they also interviewed J.H. In this second interview, B.B.[3] said that he had, in fact, had sexual intercourse with the Defendant on multiple occasions, mostly in the closet of her classroom but once in her SUV. He explained that he lied previously because he did not want to be expelled from school. B.B. also told detectives that he and the Defendant texted each other. During C.B.'s interview, police officers told C.B. that the Defendant accused him of raping her. During J.H.'s interview, J.H.[4] said that he had engaged in sexual activity with the Defendant. J.H.'s phone had a contact named "Baby doll" with the Defendant's phone number associated with that contact.

After these interviews, police searched the Defendant's classroom and closet, where they found a journal signed by the Defendant's past students and also a piece of a condom wrapper. DNA testing on the condom wrapper indicated that two people had handled the wrapper and that the majority of the DNA on the wrapper was contributed by a female. Agents were unable to compile a complete DNA profile of the female donor of the DNA present on the wrapper, but the Defendant could not be ruled out as the donor of the partial profile agents were able to compile. The detectives found five personal photographs on the Defendant's work computer, and one of those pictures was of B.B. at school with his feet resting on a desk.

Police also examined the phone records of the Defendant, C.B., B.B., and J.H. Those records indicated that the Defendant and C.B. exchanged text messages with one another 841 times between March 10, 2008, and September 23, 2008, with some of those texts occurring as late as 1:00 a.m. The two exchanged 180 texts in March 2008, 90 texts in April 2008, 282

---

[3]Again, the majority of claims made by B.B. are discussed in the sentencing portion of the facts because the jury acquitted the Defendant of the charges against her related to B.B.

[4]The majority of the claims made by J.H. are also presented in the sentencing portion of the facts because the jury acquitted the Defendant of the charge against her related to J.H.

texts in May 2008, 8 texts in June 2008, 127 texts in July 2008, 119 in August 2008, and 35 in September 2008. Between November 2007 and September 2008, the Defendant and B.B. exchanged 719 calls or texts, with the Defendant sending B.B. 392 texts. Between May 2008 and August 2008, the Defendant and J.H. exchanged 1686 texts and voicemails, with the Defendant sending J.H. 891 text messages during that three-month time period. In May, the period the two exchanged the most texts, the Defendant sent J.H. 660 text messages and he sent the Defendant 583 text messages.

Describing his reaction to the events in this case, C.B. testified, "[I]t's definitely something that's overwhelming, especially when, you know, it may be, like, something that you can imagine happening, but actually when it happens to you it completely changes your perspective on things."

The Defendant called Jeff Gregory, the pastor at the Defendant's church, as a witness. Gregory testified he assisted the Defendant in retrieving her personal items from her classroom on September 23, 2008. Gregory recalled that the principal of the school was also present, as were a man named Keith Cole and the Defendant's husband, Doug Binkley. Cole and Binkley carried boxes out to the car, while Gregory and the Defendant packed her personal items. The two moved to the closet, where he said he moved and cleaned out every item on every shelf of the closet. The Defendant, who was weeping and crying, told him to whom the items belonged, and he boxed up the items that belonged to her and returned to the closet the items that belonged to the students or the school. Pastor Gregory testified he never saw a condom wrapper in the closet.

Kenneth Cole, another pastor at the church, testified that attendance records indicated that the Defendant and her husband attended church together every Saturday night in the month of August 2008. On cross-examination, Cole conceded that attendance is not actually taken at the church service but only during the Sunday, or Saturday, school small groups. He also agreed that the attendance records indicated that there were times that Doug Binkley attended church when the Defendant did not.

The Defendant's husband, Doug Binkley, testified that he bought the Defendant a Nissan Armada for Mother's Day in 2008. He said that, during the 2007-08 school year, his daughters rode the bus to the Defendant's school every day after school. Binkley said the first time he learned of his wife's allegation that C.B. raped her was at the police station. She had, however, told him about rumors that the two were romantically involved. On cross-examination, Binkley testified that he had never before heard of the name J.H. and did not think it was true that his wife, the Defendant, exchanged over 1200 text messages with J.H. He said he had heard of C.B. and B.B. and that his daughters said that they sometimes saw B.B. after school. Binkley testified that he was unaware that the Defendant exchanged text

messages with C.B. during late night and early morning hours.

Kailen Goddard, a technology specialist, testified that he examined the Defendant's cell phone records for the period of November 2007 through September 2008. He noted that the Defendant sent or received 38,843 text messages over the course of that year. 3246 of those calls or texts were exchanged with C.B., B.B., and J.H. The Defendant exchanged 4588 texts or phone calls with a phone belonging to another student Courtney Meece, and some of them were also during the late-night hours. The cell phone records indicated that during that time period the Defendant also exchanged: 3898 with her husband Doug Binkley, 1793 with Austin Crafton; 1682 with an unknown number; 1375 with Matt Dunlap; 1207 with Adam Brown; 915 with Colby Gallahan; 845 with Derek Meadows; 719 with an unknown number; 741 with Kelsey Raines; 789 with Vince Dahl; 414 with Josh Martin; 382 with Seth Cline; 309 with an unknown number; 363 with Hailey Duke; and 474 with another unknown number. Many of these people, the Defendant testified, were current or former students.

The Defendant testified that she had been married for almost eleven years and that she had eleven-year-old twin daughters and a son who was almost five years old. The Defendant recounted the events of March 20, 2008, when the incident in the volleyball locker room occurred. She said she and her husband woke early that morning, she got the children ready for school or the babysitters, and she dropped her girls off at school and her son off at his babysitter's house. She then arrived at school and taught her first period class. The Defendant said she had to leave her classroom for her second period, and it was her custom to go to the volleyball office to grade papers. She saw C.B., her second period aide, and he said he was going to the gym to see what the gym classes were doing. The Defendant then went alone to Ms. Lesemann's office to get the volleyball locker room keys and then went to the volleyball locker room, where she closed the door while she used the restroom. The Defendant said she then propped the door of the volleyball locker room open with a chair.

The Defendant said C.B. came into the room while she was grading papers and told her that the other students were watching a movie in the auditorium. She invited him in to help her grade papers or told him he could go and watch the movie. The Defendant said C.B. said he had a better idea and the next thing the Defendant knew he turned off the lights and shut the door. The Defendant said that C.B. grabbed her and kissed her, and she told him to stop. The Defendant said C.B. "forced" her to the floor and told her she was going to give him some "head." She said "no" but he grabbed the back of her hair and forced his penis into her mouth. The Defendant said C.B. picked her up and put her on the desk. He then pulled her clothes off and penetrated her. The Defendant said she repeatedly asked C.B. to stop, and he told her to be quiet because someone would hear her. The Defendant said that when C.B. "finished" she grabbed her clothes and went into the bathroom and locked the door where

she sat against a wall and cried.

The Defendant said she did not tell anyone about this incident. She said that she just wanted to move on with her life and act as if nothing was wrong. She further explained her actions in this regard by saying that she felt that the administration did not properly handle a previous complaint she had made to them about a less serious, unrelated, allegation by her against a student. The Defendant recalled that, when she earlier reported that a student threatened her, the school administration refused to remove him from her class. They only removed him after a State of Tennessee liaison required them to. Further, she stated, the school required that she call the student's father, and he berated her when she did so. The Defendant also blamed her childhood for her failure to report. She recounted that her father was an alcoholic and abusive father. She said she had also previously been raped when she was fourteen years old.

The Defendant denied that she gave C.B. a birthday card or $100 for his birthday. She said that C.B. came to her and told her that she was going to buy him an Xbox for his graduation. He gave her money that he had saved and told her that he expected her to buy the rest and to also pay for the service agreement. She said the only time she sent him text messages was to find out what he had been saying about her, because she had heard rumors that she knew originated with him.

The Defendant conceded that she had, in fact, told Kim Meadows that she wanted to separate from her husband, but she explained her husband never knew she felt this way. She said she and her husband had an argument at the time she said this to Meadows. She said, however, she never intended to divorce him.

The Defendant denied ever engaging in any sexual act with B.B. She explained that his allegation could not be true because her daughters rode a school bus from their school to her school and arrived at her school everyday around 3:20 p.m., shortly after school was dismissed for the day. The Defendant also denied putting a picture of B.B. on her computer at school, saying that the computer was not password-protected and anyone could have placed the picture there. She asserted B.B. himself placed his own picture on her computer when he acted as her teacher's aide.

The Defendant discussed the events of September 23, 2008, saying that B.B. texted her in the morning telling her he would be late for class. She assumed that he meant he was in the building, either using the restroom or getting a snack from the vending machine. She, therefore, marked him present and sent her attendance record to the administration office. When he did not show by the end of class, she made herself a note to go to the attendance clerk to correct the error. Before she could go to the office, the attendance clerk called her

and asked about the error. This was when, she said, she sent the text to B.B. that said, "Where the heck are you?" The Defendant said that when Assistant Principal Venable told her that the police wanted to see her and Officer Martin would drive her there, Venable specifically told her that she could not take anything with her to the police department. This was why, the Defendant said, she gave her phone to a student to give to Meadows to hold for her.

The Defendant disputed the phone records, which indicated that she texted J.H. with frequency. She also disputed that she ever spoke with J.H. on the phone and said that she did not associate the number J.H. said belonged to him with J.H. She associated that number with one of two girls, one of whom may have been J.H.'s girlfriend. She denied knowing that he had her phone number associated with the name "Baby doll" in his contacts on his phone, and she denied that she had his phone number in her cell phone at all.

On cross-examination, the Defendant conceded that after the sexual incident with C.B. she did not ask that he be removed as her teacher's aide. She agreed that she sent him eighteen text messages between 12:24 p.m., after this incident occurred, and 3:00 p.m. The Defendant conceded that she sent messages to C.B. via the social Internet site Facebook. On August 5, 2008, in one of these messages she wrote the following:

Hey, I was just checking out Derek [Meadow's] page and saw you listed. Just taking a chance you will respond this way since you can't answer a text because of your girlfriend. Hope everything is good and you're still planning on going to Austin Peay. Talk to you soon, hopefully.

On September 21, 2008, two days before she was arrested, the Defendant sent another message to C.B. through Facebook that stated:

Please explain to me why I can be friends on here with all of your friends and not you. I'm surprised they actually sent requests. Lennon started this. LOL. The decision is yours, but I promise to only send you messages, not wall posts. LOL.

C.B. responded, "Send me another request. You can be my friend. LOL." Shortly thereafter, the Defendant again sendt a message to C.B., which stated:

You are such a goof. I wasn't mad. I was just wondering. You still owe me. When are you going to pay up? LOL.

Later the same day she wrote:

What have you told all your friends about us? Just curious. One of them, not Derek this time, is hitting on me. Besides Lennon, do they know we are still friends and talk?

In rebuttal, the State recalled Robin Venable, the assistant principal, and she testified about the incident involving the Defendant and a student who was removed from her class. She said that Principal Gideon made the decision to remove the student and that there was no involvement from the State of Tennessee educational system. Further, she said that her records indicated that the student never threatened the Defendant, and the Defendant made no mention of this in her written report. The decision to remove the student from the classroom was made because the Defendant responded to the student's disruptive behavior in class by calling the student a "liar" and an "ass." Assistant Principal Venable also testified that she never told the Defendant that she could not take anything with her to the police department.

Based upon this evidence, the jury found the Defendant guilty of two counts of statutory rape by an authority figure, both against C.B., and it acquitted her of the four counts of statutory rape by an authority figure that stemmed from her interactions with B.B. and J.H.

## B. Facts Presented at Sentencing

The trial court held a sentencing hearing wherein it explained that the Defendant had been convicted of two counts of statutory rape by an authority figure, and, as a Range I offender, her sentencing range was between three and six years on each count. Probation, the court explained, was not allowed for a conviction of this offense.

The following testimony was presented at the hearing: Benny Bills, the Director of Sumner County Schools, testified that the school system trains teachers to not text message students unless it is school-related or an emergency. The school system trains teachers to "maintain a professional relationship between the teacher . . . and the students." Bills testified that cases such as the Defendant's, which involve inappropriate behavior with a student, disrupt school instruction and create bad publicity for the individual school and the school system itself. The Defendant, he said, had been terminated from the school system.

Principal Gideon testified that during teacher training each year teachers are cautioned about social networking and text messaging between students and teachers. Further, each year, they discuss with teachers inappropriate contact with students. He said that there was no policy against teachers exchanging text messages with students but that they emphasized maintaining a professional relationship with the students. He said he stressed to teachers to

-13-

never be alone in a classroom with a student of the opposite sex and to never write or text anything that they did not want to defend in a court of law.

Principal Gideon testified that the Defendant's crime had been a "big distraction" that had taken focus away from their school's main purpose of educating children. He said it had been an "embarrassment" and had been difficult for the faculty and staff because of the association they had with the Defendant. He said every time he went to meetings he was asked about the trial when the topic of discussion should be focused on how to make the high school better. On cross-examination, Principal Gideon agreed the Defendant had never been reprimanded during her tenure as a teacher.

Rich Haglund, General Counsel for the State Board of Education, testified that, between 2005 and 2009, seventy-eight teachers across the State of Tennessee had their licenses suspended or revoked for an inappropriate relationship with a student. Of those seventy-eight, fifty-four involved some type of touching between teachers and students.

Todd Hodgken, J.H.'s step-grandfather, testified that he purchased J.H.'s cell phone for him. Hodgken confirmed that the number that J.H. gave to police in this case as belonging to him was, in fact, the number of the cell phone that he purchased for J.H.

Yevette Groft testified that she had six children, three of whom had attended the high school where the Defendant taught. She said that her youngest, Obadiah, was a sixteen-year-old junior at the time of sentencing. The Defendant was one of his teachers during his freshman year. Groft testified she spoke to Principal Gideon about the Defendant's behavior, which she found inappropriate. She recalled an incident where, on the night of school registration, she went into the auditorium and heard a female voice "squeal" her son's name from across the room. She saw the Defendant approach her son and say "I'm not supposed to but" and then hug him. She learned the Defendant had asked Obadiah to be her teacher's aide, but that he declined. Groft testified that two weeks later the Defendant pulled up beside her while the two were driving, rolled down the passenger's window of her car, and spoke to her son in a "high-pitched" and "squealing" voice. Groft was surprised to find it was an adult in the car rather than an adolescent girl. Groft found these interactions "very inappropriate" and told her son that she would have a "problem" with him ever having the Defendant as a teacher again. Groft identified a letter that she wrote to Principal Gideon expressing her concern about the Defendant's behavior, which was dated September 26, 2008.

The State entered a journal found in the Defendant's closet at school. The entries contained in the journal were written by her former students. One entry read:

Sexy Sandra: I had fun in your class. It was pretty awesome at times. Stay cool for all your other students to come. Don't forget me, Wade and Daniel. I think you are possibly the most awesome teacher I've ever had since the fourth grade. I appreciate you letting me talk about you (and smack your butt). I hope to see you some next year when I'm a big sophomore. Well, stay cool and kinky. It was nice getting to know every inch of you. Tap that ass later,

Another entry read:

Sandy, you are so sexy. I enjoyed looking at your butt. It is so nice. I also enjoyed all them dates we went on. They were just fun – let's say fun. Call me.

A third entry read:

Mrs. Binkley, hey sexy. This has been the best math class I have ever had. Who knew math could be so fun. I've never had a teacher as cool as you. You're just fine – one of the kids. I want to thank you for all the times you took time out and listened to me. You really made me feel better when I quit football. I'm sorry about not riding with you at the carnival. I was seriously going to ride with you. You better keep all the gifts I gave you because they're all from my heart. I really love you and if you and Doug separate I will be ready to take his spot. I will miss you over the summer.

Amanda B., C.B. and B.B.'s stepmother, testified about the impact that the Defendant's behavior and the resulting trial had on her family. She said she had to explain sex to her youngest child, who was only eight years old, because he got in a fight at school after another child called C.B. a rapist. Amanda B. said that, while her son C.B. was the victim, she felt like he was the defendant because she kept having to defend his name as he was repeatedly called a rapist. Because of this event, her sons had been interrogated, forced to sit in court, not allowed to talk to their parents, and endured all that went along with this trial. Before this, C.B. was an honor student and had done well in school. Now, he was withdrawn, and she opined that this would affect his future relationships. Amanda B. testified that she and her husband had suffered financial loss as a result of having to be present for court on so many occasions.

C.B. testified that, at the time of sentencing, he was nineteen years old and still living in the area. He said that, even after the trial, the Defendant continued to call him a "rapist." He submitted a victim impact statement in which he stated that since the time that this case became publicized by the media his life had changed drastically. He woke up every morning

with a new stress brought upon by fear of being punished for what had happened on public property. He said that, when the word "rape" became public, he became "weary" and had the feeling of his "stomach [being turned] upside down" because people now associate his name with "the world's most horrid crime." C.B. said he felt "ashamed" and was "intimidated by people in public," wondering what they were thinking. All this, while knowing that he was innocent of rape. C.B. expressed sympathy for his brother, B.B., who had his credibility "trash[ed]." He said he and his brother were telling the truth.

In his impact statement, C.B. discussed how difficult it had been to have his and his brother's names associated with "sex" and for them both to be ridiculed. C.B. said the Defendant's actions have affected his relationship with his girlfriend and those related to her. He said he felt placed in a "new lower class of people, one that isn't understood by others who are on the outside." C.B. felt "down more than up" and wondered if he could "ever possibly become something someone would actually want to strive to be."

C.B. said that, after the Defendant accused him of raping her, he did not want to "show his face" in places where there were people who knew both of them because he was scared about what they may think. He said he "never felt as free as I once did" and only went to school, his job, and home. C.B. said he often thought about questions like "What about my high school reunion? Will this ever go away? Could people ever look at me different? Did I ruin a family? Why rape? What would this be like if genders were reversed? Does her husband want me dead? How many guys has she been with? Do I have an STD?"

C.B. said his family had also been affected. His youngest brother had gotten into a fight at school for defending C.B.'s name. C.B. said he wondered what his father, who was very important to him, thought about this situation. C.B. said his parents stuck by him even though he had been labeled a rapist. Then he said, "I cannot think of a word that I would rather bury than that, completely making it no longer exist."

C.B. said this case had "lower[ed] his self-esteem" and had gotten in the way of him "living." He had been confronted at his place of employment about this case, which made him embarrassed and ashamed.

C.B. said that after irreplaceable harm to his reputation and such a long and drawn out trial, he felt the Defendant should serve the maximum sentence. He felt this was not a harsh punishment because the Defendant's actions did not start with him but had begun well before him.

After reading his victim impact statement aloud at the sentencing hearing, C.B. testified about an incident that occurred before the charges in this case were filed. He said

that he, B.B., Derek Meadows, and Lennon Brooks were trying to get some alcohol. They called the Defendant and asked her to purchase them "Sparks," an energy drink mixed with alcohol. They requested four six-packs, meaning twenty-four drinks. The Defendant met them in Franklin, Kentucky, close to where the Defendant lived, with four cases, or forty-eight drinks. Because it was so expensive, they asked if they could keep only the twenty-four and she could return the rest. The Defendant agreed and returned the remainder of the alcohol to the store. C.B. said that the Defendant purchased alcohol for them on multiple other occasions.

Derek Meadows and Lennon Brooks testified and confirmed recalling a time when the Defendant purchased alcohol for them, C.B., and B.B. They said the Defendant told the boys that she was going to a Wal-Mart in Franklin, Kentucky. They agreed to meet her there but, when they arrived, the Defendant told them that Franklin was a "dry" county. The Defendant and the four boys went to the state line at the edge of Portland. The Defendant went into a bar beside "Jim's Place" and bought the boys Sparks, which was an alcoholic energy drink. She purchased more than they wanted, so they bought from her what they wanted. Meadows assumed the Defendant returned the remainder of the alcohol. On cross-examination, Meadows recalled one other incident when the Defendant purchased alcohol for C.B. and him. He said that he and C.B. were together and that the Defendant took C.B. back to C.B.'s house. On the way, the Defendant purchased alcohol for the boys.

The Defendant called Dr. Sandra Phillips, who testified that she first met the Defendant in 2001, when the Defendant had been married three years and had twin girls. The Defendant indicated that she had been depressed for about two years and that she thought her depression may be related to her hormones. The Defendant said she felt emotional distance from her mother and also said she had difficulty dealing with the declining health of her grandfather. The Defendant described her childhood to Dr. Phillips, saying that she witnessed her father beating her mother almost every day. The Defendant reported that her father had beaten her some, until her grandfather threatened to kill him if he ever touched the Defendant or her brothers again. At the time, the Defendant, who Dr. Phillips diagnosed as clinically depressed, had problems with anxiety and suicidal thoughts.

Dr. Phillips said she saw the Defendant eleven times in 2001, and once a month for the first six months of 2002. The Defendant progressed and, ultimately, the two terminated the Defendant's therapy.

After the Defendant's arrest, Dr. Phillips again began treating the Defendant, who became clinically depressed, requiring medication. She said the Defendant worried about what would become of her family and how her children might be affected if she received a long prison term. Dr. Phillips opined that the Defendant was at a much lower "risk to

offend" then other defendants convicted of sexual crimes with whom the doctor had worked. She said the Defendant "understands that she put herself in a dangerous situation with a young man. She's questioned herself about allowing herself to get as close as she did to young people."

On cross-examination, Dr. Phillips testified that the Defendant has maintained that C.B. raped her.

The Defendant's daughters testified on her behalf. They spoke of missing their mother, who would do their hair for them and sit with them on the couch. The Defendant's daughters testified that they are lonely without her.

Based upon this evidence, the trial court sentenced the Defendant to six years for each of convictions. It then ordered that the sentences run consecutively, for a total effective sentence of twelve years in prison, to be served at thirty percent.

The Defendant read the following statement of allocution:

First, I want to say I'm truly sorry for the harm caused to [C.B.'s family], the county school system, my family, and the lives of those that have been affected by this case.

As I sit here today incarcerated, I have to believe that something good can come of this. I believe that none of this has surprised God as He knew all my days before any of them came to be. Although I recognize I cannot go back in time and change any of the decisions I made, I can use my future for good. I can and will use my skills while incarcerated to help others learn so that I can say that my time in here is beneficial to others, and that I may make the best that I can out of a terrible situation.

I can assure this Court and all concerned that I have learned great lessons in the past 18 months . . . lessons that will ensure my continual good and lawful behavior, both now and in the future. I hope the Court will recognize that I have a strong and supportive family, a husband and children that need me and a long history of good and lawful behavior, such that I'm not a risk to the community and that I am a good candidate for future lawful conduct and for sentencing alternatives to incarceration. Although I recognize that I will likely spend some time in jail, I vow to do that time with good behavior and a view to the future not looking to the past.

-18-

I can only hope this court will show leniency on me and that I may return soon to my husband and children who desperately need me. In any event, I trust that God will use this for His glory.

The trial court then sentenced the Defendant. The trial court applied enhancement factors (7), that the Defendant committed this offense for her own sexual gratification; and (15), that she committed this offense on the grounds or facilities of a school. T.C.A. § 40-35-114(7), (15). The trial court also found that two mitigating factors applied: factor (1), that the crime neither caused nor threatened serious bodily injury; and factor (13), the catch-all provision, based upon her lack of criminal record and supportive family. T.C.A. § 40-35-113(1), (13). After considering all the applicable statutory considerations, the trial court sentenced the Defendant as a Range I offender to six years for each of her convictions, and it ordered the sentences to be served consecutively, for a total effective sentence of twelve years, to be served at thirty percent.

## II. Analysis

On appeal, the Defendant contends that the trial court erred: (1) when it excluded testimony from her expert witness; and (2) when it improperly sentenced her to the maximum sentence within her range and improperly imposed consecutive sentences.

### A. Expert Witness Testimony

The Defendant contends the trial court erred when it refused to allow Dr. Sandra Phillips to testify during her trial. The Defendant asserts that she was not offering Dr. Phillips's testimony to bolster her own credibility but, instead, to explain to the jury why a rape victim might not resist during a rape. The State counters that the trial court properly excluded the testimony because the testimony was not relevant unless considered in light of the victim's testimony. The State explains that the Defendant had testified at trial that she did not report the rape because she wanted to bury it and move on with her life, and Dr. Phillips's proposed testimony was going to be that, generally speaking, some rape victims do not report crimes for various reasons. Therefore, Dr. Phillips's testimony would directly bolster the Defendant's story. Further, the State asserts that Dr. Phillips's testimony did not constitute that of an expert because it was not scientific in nature.

Before trial, it became apparent that the Defendant intended to allege that C.B. had raped her, but that she had not reported this sexual assault. She blamed her failure to report the rape on the fact that she had been the victim of a previous rape. The Defendant sought to offer the testimony of an expert, Dr. Sandra Phillips, to explain "why a rape victim might not report and why a rape victim might not fight back." The State filed a motion in limine

to exclude such testimony. A hearing was conducted during the trial, but outside the presence of the jury. The Defendant's attorneys told the court that they did not intend to "relate" Dr. Phillips testimony "in any way back to the [D]efendant" but that they proposed to offer her testimony "to help assist the jury in understanding why a rape victim might or might not do something." The trial court found that this testimony was being offered to show that the Defendant did not report the rape based upon a mental condition, that being emotional trauma from a previous alleged rape. Further, it found that the testimony was being offered to bolster the Defendant's credibility. Therefore, the court concluded, the testimony was inadmissible consistent with *State v. Ballard*, 855 S.W.2d 557 (Tenn. 1993).

In an offer of proof made after the trial court's ruling, Dr. Phillips testified that she had worked with "many hundreds" of rape victims throughout the course of her thirty-three year career. She described most of the victims as going through two early stages after the rape, the first being "absolute complete shock," and the next being a period of denial. Victims, she said, often attempt to maintain control over their environment and hide their experience out of shame and fear of being blamed. Dr. Phillips testified that a 2006 Department of Justice study reported that only one in five victims report rape. The study cited three main reasons for the failure to report: (1) fear of retaliation from the rapist; (2) feeling ashamed; and (3) feeling embarrassed or that it was not a police matter. About a victim's failure to fight off her attacker, Dr. Phillips testified that fear may prohibit a victim from fighting and that a woman's passivity did not imply her consent.

After Dr. Phillips's testimony, the trial court reiterated its finding that the testimony was too speculative and was inadmissible.

Determinations regarding the admissibility of expert testimony are left to the sound discretion of the trial court. *Ballard*, 855 S.W.2d at 562. On appeal, our standard of review is whether the trial court abused its discretion by allowing the expert testimony. Before reversing the trial court's determination, we must determine that the record shows that the trial court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999); *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997).

The rules that govern the admissibility of such evidence are Tennessee Rules of Evidence 702 and 703. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

In addition to complying with Rules 702 and 703, the evidence must be relevant under Rule 401. *McDaniel*, 955 S.W.2d at 264 n.8. Therefore, the trial court must "determine that the expert testimony is reliable in that the evidence will substantially assist the trier of fact to determine a fact in issue and that the underlying facts and data appear to be trustworthy." *Brown*, 181 S.W.3d at 274.

Tennessee Rule of Evidence 702 is more stringent than its federal counterpart, in that it requires the expert testimony to "*substantially* assist the trier of fact," while the federal rule requires only that the testimony "assist the trier of fact." Tenn. R. Evid. 702 (emphasis added); Fed. R. Evid. 702 (emphasis added); *see State v. Coley*, 32 S.W.3d 831, 834 (Tenn. 2000); *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 264 (Tenn. 1997). "This distinction indicates that the probative force of the testimony must be stronger before it is admitted in Tennessee ." *McDaniel*, 955 S.W.2d at 264. Also, Tennessee Rule of Evidence 703 states that "[t]he court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." There is no such restriction on expert testimony under the federal rule. *See* Fed. R. Evid. 703; *McDaniel*, 955 S.W.2d at 264-65.

In *Ballard*, the defendant appealed his conviction based upon the trial court's admission of expert testimony that his victim exhibited symptoms of post-traumatic syndrome. 855 S.W.2d at 560. In that case, the expert had testified that each of the victims, who the expert interviewed and considered separately, exhibited symptoms of post-traumatic syndrome brought upon by the precipitating event of the defendant's sexual abuse. The Court, agreeing that the doctor was qualified as an expert, determined that "the testimony must be evaluated in terms of its probative value versus its prejudicial effect." The Court explained:

> In the context of a criminal trial, expert scientific testimony solicits the danger of undue prejudice or confusing the issues or misleading the jury because of its aura of special reliability and trustworthiness. *United States v.*

*Green*, 548 F.2d 1261 (6th Cir. 1977). This "special aura" of expert scientific testimony, especially testimony concerning personality profiles of sexually abused children, may lead a jury to abandon its responsibility as fact finder and adopt the judgment of the expert. Such evidence carries strong potential to prejudice a defendant's cause by encouraging a jury to conclude that because the children have been identified by an expert to exhibit behavior consistent with post-traumatic stress syndrome, brought on by sexual abuse, then it is more likely that the defendant committed the crime. Testimony that children exhibit symptoms or characteristics of post-traumatic stress syndrome should not suffice to confirm the fact of sexual abuse. The symptoms of the syndrome are "not like a fingerprint in that it can clearly identify the perpetrator of a crime." *Mitchell v. Commonwealth*, 777 S.W.2d 930, 932 (Ky. 1989). Expert testimony of this type invades the province of the jury to decide on the credibility of witnesses.

We are also troubled by the accuracy and reliability of expert testimony involving the emotional and psychological characteristics of sexually abused children. When expert testimony involves a novel kind of scientific basis that has not received judicial approval, a court must first determine whether the basis upon which the testimony is built is reliable enough to assist the jury to reach an accurate result. The State advanced no evidence at trial that the facts underlying [the doctor's expert] testimony were of a type reasonably relied on by experts in the particular field, Tenn. R. Evid. 703, or that it is possible to make a statement that sexually abused children will exhibit the same characteristics or traits.

*Id*. at 561-62 (some citations omitted). The Court ultimately concluded that the trial court abused its discretion when it allowed this testimony, and it reversed the defendant's conviction.

In the case under submission, we agree with the trial court that *Ballard* controls the admissibility of the testimony at issue. The State prosecuted the Defendant on charges of statutory rape by an authority figure. The Defendant admitted that she and the victim engaged in sexual activity, but she alleged that the victim had raped her. She sought to introduce expert testimony about why a victim of rape might not fight back and might not report. We first conclude that the expert's proposed testimony was speculative in nature because it was too generic. *See id*. at 562. Further, the proposed testimony was not reliable enough to "substantially assist" a jury in an inquiry of whether the crime of rape had taken place. *See* Tenn. R. Evid. 702; *Ballard*, 855 S.W.2d at 562.

Finally, Dr. Phillips's proposed testimony was the type of expert testimony that would invade the province of the jury to determine the credibility of witnesses. *Ballard*, 855 S.W.2d at 561. The jury in this case had to determine whether C.B.'s account of the sexual encounter in the volleyball office was more credible than the Defendant's account of the same encounter. The Defendant's account included that she did not fight C.B. during the rape and that she did not report the rape. Allowing an expert to testify about why some rape victims do not fight their assailants and why some rape victims do not report a rape would directly bolster the Defendant's testimony. Therefore, this proposed testimony falls squarely into the type that *Ballard* instructs is inadmissible. The Defendant is not, therefore, entitled to relief on this issue.

## B. Sentencing

The Defendant contends that the trial court erred when it sentenced her to the maximum sentence within her range and when it ordered her sentences to run consecutively to each other. When a defendant challenges the length, range, or manner of service of a sentence, this Court must conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2006). This presumption, however, is conditioned upon the affirmative showing in the record that the trial court properly sentenced the defendant. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). As the Sentencing Commission Comments to this section note, the burden is on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts. If the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration to the factors and principles relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result was preferred. T.C.A. § 40-35-103 (2006), *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court that are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In conducting a de novo review of a sentence, we must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated

sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2006); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The Criminal Sentencing Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2) and (d) (2006); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). Tennessee Code Annotated section 40-35-102 enumerates principles for a trial court to consider when determining whether a sentence promotes justice. Those factors are as follows:

(1) Every defendant shall be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense;

(2) This chapter is to assure fair and consistent treatment of all defendants by eliminating unjustified disparity in sentencing and providing a fair sense of predictability of the criminal law and its sanctions;

(3) Punishment shall be imposed to prevent crime and promote respect for the law by:

(A) Providing an effective general deterrent to those likely to violate the criminal laws of this state;
(B) Restraining defendants with a lengthy history of criminal conduct;
(C) Encouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs that elicit voluntary cooperation of defendants; and
(D) Encouraging restitution to victims where appropriate;

(4) Sentencing should exclude all considerations respecting race, gender, creed, religion, national origin and social status of the individual;

(5) In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society and evincing failure of past efforts at rehabilitation shall

be given first priority regarding sentencing involving incarceration; and

. . . .

T.C.A. 40-35-102.

Significantly, the 2005 amendments deleted as grounds for appeal a claim that the trial court did not weigh properly the enhancement and mitigating factors. *See State v. Carter*, 254 S.W.3d 335, 344 (Tenn. 2008) (citing 2005 Tenn. Pub. Acts ch. 353, §§ 8, 9). Rather, a defendant may now appeal on the basis (among others) that the sentence "is excessive under the sentencing considerations set out in §§ 40-35-102 and 40-35-210." T.C.A. § 40-35-401(b)(2) (2006).

### 1. Length of Sentence

The Defendant does not dispute the trial court's application of two enhancement factors but states that the trial court erred when it disregarded the conclusion in the psychosexual report that the Defendant had a good potential for rehabilitation. Further, the Defendant states that the trial court erred when it disagreed with the medical expert testimony that she had a good potential for rehabilitation.

It is apparent from the record that the trial court thoroughly reviewed the relevant statutory principles. It stated:

> So in determining the appropriate sentence for these offenses I've considered the evidence presented at the trial and at the sentencing hearing, the presentence report, the principles of sentencing, arguments made as to sentencing alternatives, the nature and characteristics of the criminal conduct involved, the evidence and information offered by the parties on the mitigating and enhancement factors.
>
> I've also considered the statistical information provided by the state in this case involving two exhibits. I've considered the allocation statement that the [D]efendant made today, and I've considered her potential for rehabilitation or treatment and I have also read and re-read and re-read this psychosexual report.

Further, the trial court properly applied two enhancement factors, which the Defendant does not contest on appeal. In finding those enhancement factors, the trial court stated:

I do find and I think it's agreed here that Number 7, the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement. I find overwhelmingly that this is an enhance[ment] factor that needs to be applied in determining the range of sentence. And . . . I think it's appropriate that I set the outline here of this case by setting out factors here that show this crime involved a victim and was committed to gratify the [D]efendant's desire for pleasure or excitement.

The victim spent one and a half hours every school day with the [D]efendant from January until this incident occurred. He was her teacher's aide. He sent a picture to her with his shirt off. And she told a teacher, Barbara Dorris, how hot he looked when he didn't have a shirt on, and she also noted that the [D]efendant would talk about C.[B.] frequently.

Lennon Brooks testified that the victim got suggestive text messages from the [D]efendant. Robin Venable, the assistant principle, mentioned to Deputy Scott Martin about how they looked walking together. And Martin testified he never saw a teacher and student walk like that side by side, [D]efendant and victim. He testified that it just didn't look right, and he brought . . . it to the attention of Ms. Venable.

841 text messages between [the Defendant] and this student, back and forth, either before or after the sex.

Kim Meadows testified that this was a flirtatious relationship. Both the [D]efendant and the [student] were equally flirtatious. The [D]efendant gave gifts to the victim: a birthday present, $100; a graduation present, Xbox 360 Elite.

There's testimony about the sexual or the marriage relationship that came out during the course of this trial. To the victim the [D]efendant said that their marriage was going through hard times. There could be a divorce. Now, this is to a 17-year-old student. . . . [S]he said to [B.B], a 16-year-old student that there were problems with her husband. And, lastly, to a lifelong close friend, Kim Meadows, she stated around March of 2008 that she was going to separate from her husband but will wait until the girls' birthday. Now, is there any significance in the fact that this sexual event occurred during this period of time?

This psychosexual [report] reveals that the [D]efendant was sexually

active since the 11th grade, high school, [and in] college and she said that prior to the alleged incident in the school she and her husband had not been active sexually. Is there any significance to what happened.

After having oral intercourse and sex with the victim in March, she had breast augmentation surgery in June of 2008. Now, after she says she was raped and after all this occurs, she has breast augmentation surgery, and after having oral sex and intercourse with the victim in March, she showed the victim her breasts at her home in the summer of 2008. They kissed; she had oral sex on him; he couldn't get aroused. He went to the children's room to try that and he still couldn't get aroused. They tried to have intercourse in her home, and he could not get aroused.

Now, is that the kind of thing a 17-year-old student is going to make up? That's reality. He could not get aroused because he was concerned about being in that house, thinking about the children, their bedroom and so forth. And she said because there would be no intercourse that he owed her one. Two days before her arrest on September 28th, 2007, on her website to [C.B.] she said, you owe me one.

Now, another enhancement factor applies, Enhancement Factor No. 15. The [D]efendant committed the offense on the grounds or facilities of a pre-kindergarten through grade 12 public or private institution of learning when minors were present. Oral sex and sexual intercourse at Portland High School during school hours, pitiful.

The trial court also applied two mitigating factors: factor (1), that the crime neither caused nor threatened serious bodily injury; and factor (13), the catch-all provision, based upon her lack of criminal record and supportive family. T.C.A. § 40-35-113(1), (13).

Before determining the Defendant's length of sentence, the trial court went through the principles to be considered by a trial court in the determination of an appropriate sentence. *See* T.C.A. § 40-35-102. About whether the sentence was justly deserved, he stated that the need to protect children in school existed without regard to whether "they're 17 or 7." He also stated that the Defendant was eighteen years older than the victim and that she had crossed the "line of authority between a teacher and a student, a line of character, a line of respect." The trial court stated that the Defendant had "obliterated the time-honored line between student and teacher." He said to her, "You followed with actions of self–gratification, pleasure, and sexual activity." The trial court then addressed the second principle, that the punishment be sufficient to prevent crime and to promote respect for the

law: "I can't state enough that there is a tremendous deterrent effect involved in preventing oral sex and sexual intercourse by a teacher and a student in school during school hours." The trial court noted that there were other cases pending before it that involved similar conduct by teachers. Finally, the trial court considered the [D]efendant's potential for rehabilitation. When considering this principle, the trial court stated:

> There's been a lot said about that today, and there's a lot of common sense to be applied, I think. We've got people with . . . Ph.D. degrees, kind of telling us the potential for rehabilitations. But I want to state that I've been here and I've observed every witness at trial, including the [D]efendant, and I have observed every witness at the sentence hearing. And sometimes it's hard to understand as a professional the dynamics of life. And [the expert witness Dr. Phillips] . . . has helped us numerous times in numerous ways [but] she only heard what [the Defendant] told her.

> Now then we get to the conclusion reached by the physiological evaluation, which was made an exhibit. And this was what this professional stated, "In light of all the evidence that I have heard and seen, the [D]efendant exercised poor judgment, failed to maintain appropriate boundaries – that's a good theory – which lead to vulnerable situations with students, particularly due to recent changes in schools' attitude toward the degree of involvement that teachers have with students' personal lives in order to detect signs of emotional problems.

> . . . .

> [T]he report said: Her offense is more consistent with that of a professional who engages in sexual activity with a client than that of a pedophile who preys on children.

> And that comes from the mouth of someone who has no understanding of a sacred relationship between a teacher and a [student], the dynamics of abuse and life. I reject that. That is not accurate.

> . . . .

> We've become a society of rationalizers. How can one be rehabilitated from oral sex, sexual intercourse with a student during school hours without grasping and acknowledging the truth? Without truth you can't have justice. Without truth you can't have rehabilitation. If somebody is not going to take

-28-

responsibility for their action, I don't see how they can be amenable to treatment.

> The truth has been very clear to me and to this jury, something that the [D]efendant has not embraced and she stands for what is untrue. You must accept that your yes should be a yes and your no should be a no; your word should be your bond. You don't rationalize by saying I misspoke, I exercised poor judgment, I misrepresented it by rationalizing, minimizing or spinning or anything else. You face up to it.

> So I don't see any evidence here of potential for rehabilitation other than the fact that she's got a clear criminal history. The facts show there is something missing with [the Defendant]. She reaches out, she grooms students to a point to where sexual activity occurs, and then she continues that grooming by gifts and other things to promote that relationship. And that is the way I see it, and I see that she does not embrace the truth.

The trial court then sentenced the Defendant to the maximum within her range, six years, for each of her two convictions.

On appeal, the Defendant contends that the trial court erred when it rejected the conclusions of Dr. Phillips and Dr. Montgomery, the doctor who completed the psychosexual evaluation. We cannot agree. First, this was only one consideration taken into account by the trial court when it set the Defendant's sentence at the maximum within her range, and the other considerations articulated by the trial court on the record fully support the trial court's decision. Further, as the trial court noted, the testimony from Dr. Phillips and the psychosexual evaluation took into account only the information provided to them by the Defendant when coming to their conclusions. The trial court, however, took into account all the information it gleaned from the trial testimony and the evidence presented. It was, therefore, in a better position to determine the Defendant's potential for rehabilitation. This Court has previously stated that a defendant's lack of candor or truthfulness was germane to his rehabilitation potential. *State v. Zeolia*, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996). As noted by the trial court, the Defendant in this case maintains that the victim raped her despite the great weight of the evidence against this allegation and the jury's rejection of her allegation. The trial court properly sentenced the Defendant to the maximum within her range, and she is not entitled to relief on this issue.

## 2. Alignment of Sentences

The Defendant next contends that the trial court erred when it ordered consecutive

sentences. She asserts that the trial court improperly based its decision upon the fact that she was convicted of two or more statutory offenses involving sexual abuse of a minor, considering the relationship between the defendant and the victim, the time span of the defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, and the physical and mental damage to the victim. *See* T.C.A. § 40-35-115(b)(5). She notes that, while she was convicted of two or more statutory offenses involving the sexual abuse of a minor, they both occurred during one incident, so this provision should not apply. The State counters that the trial court properly ordered consecutive sentences based upon this finding.

If an offender meets one or more statutory criteria in Tennessee Code Annotated section 40-35-115, whether he or she should be sentenced consecutively or concurrently is within the sound discretion of the trial court. *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A court may order multiple sentences to run consecutively if it finds, by a preponderance of the evidence, that at least one of seven factors exists. T.C.A. § 40–35–115(b)(1)-(7). In addition to these criteria, consecutive sentencing is subject to the general sentencing principle that the length of a sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-102(1), 103(2); *see also State v. Imfeld*, 70 S.W .3d 698, 708 (Tenn. 2002). Rule 32(c) of the Tennessee Rules of Criminal Procedure instructs a trial court to explicitly recite on the judgment its reasons for imposing a consecutive sentence.

The sentencing criteria used by the trial court in this case is factor (5), which allows a trial court to order consecutive sentencing if:

> The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims; . . . .

T.C.A. § 40-35-115(5).

In the case under submission, when the trial court ordered the Defendant to serve consecutive sentences, it stated:

> Now, the issue of consecutive sentencing, I must find by a preponderance of the evidence under 40-35-115(b)(5) the following factors. Number one, the defendant is convicted of two or more statutory offenses involving sexual

abuse of a minor. It doesn't say during a period of time span, how long. There is nothing other than two or more statutory offenses involving sexual abuse of a minor.

Count one, she was convicted of statutory rape by an authority figure, oral sex. Count two, statutory rape by an authority figure, sexual intercourse. The first element is met.

Number two, with consideration of the aggravated circumstances arising from the relationship between the defendant and the victim. I've touched on that, and there's nothing more sacred than a relationship between a school teacher and her student aide during the time that person is a student. That goes without any further commentary.

The next thing, the time span of the defendant's undetected sexual activity. I disagree with [the Defendant's attorney], [when he says that] the act was never proven, the Robertson County [act that occurred at the Defendant's home]. I sat here and listened to the testimony, and I saw [C.B.] testify from the beginning to the end. I saw the [D]efendant testify from beginning to end. And [C.B.] is credible, believable, honest and tries to answer the questions. [The Defendant] did not.

I find that from March 2008 until September 23rd, 2008, that that was a period of time here for the undetected sexual activity. Without a doubt it would have continued if the [D]efendant had not been arrested. She was on the prowl, grooming [C.B.], following up, you owe me one.

The nature and scope of the sexual acts from school to home involved oral sex, intercourse, mutual fondling, oral sex again, attempted sexual intercourse. That's the scope and nature of her sexual acts.

And the aggravating circumstances arising from the extent of the residual, physical and mental damage to the victim, I was . . . a little bit surprised today with something that I never even considered. And to be honest with you, I didn't know whether or not this element would apply under these circumstances, but this case is very unusual and . . . today's testimony helped me see that in that the victim in ths particular case has been called a rapist, and this situation grew like a fire out of control in California in the City of Portland and it couldn't be put out.

The effect, the residual effect of the physical, mental damage to the victim here is within the limits of this particular requirement by a preponderance of the evidence. He said today, (as read): Ever since the Binkley case hit the news and the press, my life has changed drastically. I woke up every morning with a new stress. The stress was brought on by the feeling of getting in trouble for what had happened on public property.

(As read): It wasn't until the word "rape" came up that I became very weary. It was a feeling that turned my stomach upside down, people thinking me, [C.B.], was being accused of the world's most horrid crime. I have never thought something so horrible could happen to someone so innocent.

The trial court went on to read more from C.B.'s statement about the negative impact this case, and the Defendant's allegation that he raped her, had had on himself and his family. The trial court concluded:

I find by a preponderance of the evidence that the residual mental effect on this victim here is great. The effect of the turn-around allegation of rape here is something I really didn't consider fully until today, and that has had an immense, and absolutely immense effect on the victim and the victim's family, and it will be a long time before they ever, if they ever, recover from that.

So I find that each and every element that I've outlined has been satisfied. I also find that in this particular case that the imposition of consecutive sentences should not be routinely imposed. It's something that I didn't consider in this case. I have followed the law and the evidence in making this decision.

The aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses included. I cannot state in human words the severity of the offenses committed in Portland High School. . . . I cannot, as a human, state the deterrent effect on other teachers in this world that we live in today keeping their hands off our students. I find that the aggregate maximum of consecutive terms is related to the severity of the offenses involved in this particular case.

In appealing this ruling by the trial court, the Defendant asserts first that Tennessee Code Annotated section 40-35-115(b)(5) should not apply to her sentences because there was no "period of undetected sexual activity" as it all occurred on one day. She further asserts that there was no proof that the victim suffered any residual mental damage. She next asserts

that her sentence is not the least severe measure necessary to achieve the purposes for which the sentence is imposed. This Court has not previously addressed whether the provision in Tennessee Code Annotated section 40-35-115(b)(5) requires that the two or more statutory offenses involving sexual abuse of a minor must occur during distinct sexual encounters. When interpreting a statute, we are guided by its plain language. *State v. Mallard*, 40 S.W.3d 473, 480 (Tenn. 2001). Here, the plain language of the statute does not distinguish between convictions for multiple sex acts occurring during one sexual encounter and multiple sex acts occurring during multiple sexual encounters. We, therefore, conclude that this statutory provision is properly applicable in a case such as this, where the Defendant was convicted for performing oral sex on a minor and then engaging in sexual intercourse with him.

Further, the trial court clearly and thoroughly reviewed all of the applicable provisions as required by Tennessee Code Annotated section 40-35-115(b)(5), and the evidence does not preponderate against its findings. Contrary to the Defendant's assertion on appeal that there was no period of undetected sexual activity, the trial court found that she had engaged in communication with C.B. for a lengthy period, enticed him to her home for a second sexual encounter, performed upon him oral sex, and then, because he was unable to complete sexual intercourse with her, told him he "owed" her one. Her Facebook communication confirms that she, in fact, reminded him that he "owed" her one. The trial court found that the Defendant would have continued sexual activity with C.B. but for her arrest.

We further conclude, as did the trial court, that the evidence clearly supports that the victim suffers from residual mental damage as a result of the Defendant's actions. *See* T.C.A. § 40-35-115(5). The Defendant groomed and cultivated a relationship with the victim. She sent him sexually charged texts, discussed his sexual attractiveness with her peers, and she made sexual advances towards him. Her behavior culminated with her performing oral sex upon him and then engaging in sexual activity with him. After being caught, she alleged he raped her. The rape allegation was rejected by both the jury and the trial court. C.B. testified about how this case had impacted him. He admitted that he had wanted to have sex with the Defendant but agreed that doing so changed things for him for the worse. He went on to talk about the severely negative impact the Defendant's false accusation of rape had upon his life. The trial court did not err when it found that this criterion described withing Tennessee Code Annotated section 40-35-115(5) weighed in favor of consecutive sentencing.

Finally, we address whether the effective twelve year sentence is reasonably related to the severity of her offenses and whether it was the least severe measure necessary to achieve the purposes for which the sentence is imposed. After reviewing cases involving similar crimes, we conclude that the Defendant's sentence is not out of line with the sentences imposed in those cases. *State v. Julie Petty*, No. M2008-02732-CCA-R3-CD, 2010

WL 2432010, at *1 (Tenn. Crim. App., at Nashville, June 10, 2010) (defendant, who was a teacher, pled guilty to one count of sexual battery by an authority figure, a Class C felony, and received a sentence of four years); *State v. David E. Offutt*, No. M2007-02728-CCA-R3-CD, 2009 WL 2567870, at *1 (Tenn. Crim. App., at Nashville, Aug. 20, 2009) (after the defendant was convicted of three counts of attempted rape, a Class B felony and two counts of sexual battery by an authority figure, a Class C felony, the trial court imposed consecutive six-year sentences for each attempted rape conviction and consecutive five-year sentences for each sexual battery by an authority figure conviction then ordered each group of sentences to be served concurrently, for a total effective sentence of eighteen years), *perm. app. denied* (Tenn. Mar. 1, 2010); *State v. Peggy Dale Hall*, No. M2005-02782-CCA-R3-CD, 2006 WL 2682726, at *1 (Tenn. Crim. App., at Nashville, Sept. 19, 2006) (defendant pled guilty to four counts of statutory rape, a Class E felony, sentences of two years each, all ordered to run consecutively for a total effective sentence of eight years), *perm. app. denied* (Tenn. Jan. 29, 2007); *State v. Ricky Grover Aaron*, No. M2002-02288-CCA-R3-CD, 2004 WL 1533825, at *1 (defendant convicted of especially aggravated sexual exploitation of a minor, a ClassB felony, and false imprisonment, a Class A misdemeanor, and received a sentence of eleven years), *perm. app. denied* (Tenn. May 2, 2005).

Further, as articulated eloquently by the trial court, the severity of this offense supports the Defendant's sentence. C.B. was a student in a school where the Defendant was his teacher. Teachers are charged with the well-being of their students. The Defendant engaged in sending a great number of text messages to C.B., seeking him out before and after the sexual encounter via phone and Facebook, buying him gifts, telling him he "owed" her another sexual encounter. This type of behavior simply cannot be tolerated. The Defendant further compounded her crime by then damaging the victim's reputation and ability to freely live his life by alleging he raped her. We agree with the trial court that this weighs heavily in favor of consecutive sentencing. She is not entitled to relief on this issue.

## II. Conclusion

After a thorough review of the record and the applicable law, we conclude that the trial court properly excluded the expert testimony offered by Dr. Phillips and also properly sentenced the Defendant. As such, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE